VARICK and BACON, plaintiffs in error, *and* JACKSON, ex dem. EDEN and WOOD, defendants in error.

There can be no disseisin in fact, except by the wrongful entry of a person claiming the freehold, and an *actual* ouster or expulsion of the true owner, or by some act tantamount thereto; such as a common law conveyance, with livery of seisin, by a person actually seized of an estate of freehold in the premises, or some one, lawfully in possession, representing the free-holder, or by a common recovery, in which there is a judgment for the free-hold, and an actual·delivery of seisin by the execution, or by leving a fine, which is an acknowledgment of a feoffment of record.

*It seems,* that under our statute of wills, a devise would be good, notwith-standing an actual disseisin; the power being given to dispose, by will, of any property, right or interest in real estate, whether the same is a vested freehold in possession of the testator, or a mere descendible hereditament or interest therein, in respect to which the testator had only a right of en-try, or a mere right of action.

The holding over of a tenant for life, after the determination of his estate, though he claims the fee, is not a disseisin of the rightful owner.

A mere adverse possession does not affect the validity of a devise. The com-mon opinion has been, that such was the effect of a technical or *actual dis-seisin,* although the doctrine upon which that opinion was founded is now doubted in the English courts.

Conveyances, which are not common law conveyances, accompanied with livery of seisin, devest no rights but those of the grantors.

The statute against champerty does not apply to devises, nor to judicial sales or assignments under the insolvent acts.

Where a person, who is directly interested in favor of the plaintiff in a cause, is called by the defendant to prove a particular fact, and is sworn as a wit-ness, the plaintiff has a right to examine him generally as to the merits of the cause.

ERROR from the supreme court. Medcef Eden, the fa-ther of Joseph and Medcef Eden, the younger, was in pos-session of a house and lot in the city of New-York, the prem-ises in question, as early as the year 1782 or 1783, by his ten-ants, who paid him rent until his decease in September, 1798. Shortly before his death, he made his will, devising portions of his real estate, including the premises in question, to his son Joseph, and other portions to his son Medcef; providing,

that if either died without lawful issue, his part should go to the survivor; and appointed his wife executrix, and his two sons executors of his will. The tenant of the premises in question, at the decease of Medcef Eden, continued to hold under Joseph until May, 1802, when Joseph rented the premises to another tenant. Joseph died without issue in 1813, and in July, 1819, Medcef Eden, the younger, also died, leaving a will, by which he devised his whole real and personal estate to his wife, one of the lessors of the plaintiff, *durante viduitate;* remainder to John Pelletreau for life, with certain trusts in favor of the devisor's children. Wood, the other lessor of the plaintiff, became the assignee of Medcef Eden, the younger, on his taking the benefit of the insolvent act in 1801. The action for the recovery of the premises was commenced in January, 1822, and tried at the New-York circuit in June, 1826, before the Hon. OGDEN EDWARDS, one of the circuit judges.

On the part of the defendants, the following evidence was adduced: A deed of the premises in question from Catharine Fine to John Bridgewater and wife, bearing date 7th October, 1767, the grantees under which deed were reputed the owners, and resided on the premises, until they went off with the British, on the evacuation of New-York, during the revolutionary war; a mortgage, executed by Bridgewater and wife to Sheffield Howard, bearing date 15th August, 1768, to secure the payment of £100, with interest, in one year; an assignment of that mortgage from Howard to Medcef Eden, the elder, for the consideration of £137 9. 8. bearing date 25th December, 1783; a further assignment of the same mortgage from Martha Eden, Joseph Eden and Medcef Eden, the wife and sons of Medcef Eden, senior, executrix and executors of his will, to Joseph Winter, bearing date 1st September, 1804, by which not only the mortgage, the bond executed as a collateral security, and the monies due and to grow due thereon were transferred, but the same contained a release and conveyance of all the estate, right, title and interest of the assignors of, in and to *the lot of ground* covered by the mortgage. This assignment contained also a recital of the devise in fee from Medcef Eden, the elder, to Joseph Eden. It

was not executed by the executrix, and from the evidence ad-- duced, the jury found that the signature of *Medcef Eden* was a forgery, but the execution of the instrument by *Joseph Eden* was proved; a deed from Joseph Winter, as assignee of the mortgage under a foreclosure, to Robert Robinson, and a re-conveyance from Robinson to Winter, bearing date 20th and 21st March, 1805; a deed, with full covenants, from Joseph Winter to Samuel Boyd, for the consideration of $2666, bearing date 1st May, in the year of our Lord *one thousand eight hundred and five;* and sundry mesne convey- ances from Boyd to Col. Varick, one of the defendants in the suit, who obtained his title on the 1st March, 1810, for the consideration of $9000. Mr. Boyd, immediately after ob-- taining a conveyance of the lot, caused some old wooden buildings which were upon it to be pulled down, and erected a valuable brick house on the same; and Col. Varick, after his purchase, expended about $2000 in a general repair of the house. The defendants also produced in evidence a bond for the payment of £168, with interest, payable in one year, dated 21st April, 1782, executed by John Bridgewater to Medcef Eden, on which was an endorsement in these words: "For the better securing this bond, the said John Bridgewater, gent. left the deeds of his house and land, to be returned when the monies paid, or to be executed, the same as a mortgage. (Signed.) John Bridgewater." *John Pel- letreau,* the devisee named in the will of Medcef Eden, junior, *was called by the defendants* to prove the execution of this bond, his name and that of Oliver Hobbes being thereto subscri- bed as witnesses; and on being sworn, he testified that the name of John Pelletreau, subscribed to the bond, was not his hand-writing. Having been sworn as a witness on the call of the defendants, the plaintiff insisted upon the right to examine him on a cross-examination on the whole merits of the case, which was objected to on the part of the defend- ants; but the objection was overruled by the presiding judge, and he was accordingly examined. To this decision of the judge, the defendants excepted. The defendants also gave in evidence a deed from Ware Branson to Joseph Winter of the premises in question, dated 17th July, 1804. Ware

Branson was the son of Mrs. Bridgewater, and claimed to be entitled to the property as the heir at law of his mother ; alleging, that the premises had been purchased by John Bridgewater with monies belonging to his mother.    The deed given by him was executed in the attic story of the house on the premises; the grantor and the agent of the grantee having obtained permission of the occupant to go into a private room for the purpose of executing the deed.    It was also proved by a witness, that he, as sheriff of the city and county of New-York, sold the premises under an execution against one of the Edens, to James R. Smith, who purchased the same for the Scotch Presbyterian Church, in the city of New-York ; that he executed a deed, but did not receive the consideration money, and did not remember what had become of the deed.    It was produced by the defendants, and bore date 10th May, 1801, and, for the consideration of $2500, conveyed all the right, title and interest which *Joseph Eden* had to the premises in question on the 8th July, 1800, to the Scotch Presbyterian Church.    Another witness, the president of the Bank of New-York, in whose favor the execution had issued upon which the sale took place, testified that he received the deed from the sheriff, but it had never been delivered to the grantees.

To rebut the presumption that Medcef Eden, the ancestor, held the premises as the assignee of the mortgage given by Bridgewater, it was proved that he told a witness that he had bought the house of Bridgewater, and paid him the money, and afterwards discovered there was a mortgage on it, which cost him £200 to take up.

The defendants, previous to entering on their defence, moved that the plaintiff be nonsuited, forasmuch as the plaintiff had not proved that *Medcef Eden, the younger,* under whose immediate devise the plaintiff claimed title, was seized at the time of the devise, nor at the time of his death ; which motion was denied, and the defendant excepted.

The judge charged the jury that the devise contained in the will of Medcef Eden, the younger, was a good and valid devise of the premises in question, notwithstanding the possession of the defendant, Richard Varick, adverse to the

claim of right of Medcef Eden, the younger, at the time the said will was made, and at the time of the death of the said Medcef Eden, the younger. To which opinion thus expressed the defendants excepted. The jury found a verdict for the plaintiff. The supreme court were subsequently applied to for a new trial, which application was refused, and judgment rendered for the plaintiff, upon which a writ of error was sued out to remove the record into this court.

For the opinion of the supreme court in pronouncing judgment for the plaintiff below, see 7 *Cowen,* 242 to 248.

*S. Boyd,* for the plaintiff in error. Medcef Eden, senior, from whom the lessors of the plaintiff deduce their title to the premises in question, was, when he made his will under which the lessors claim, a *mortgagee* of the premises by virtue of the assignment by Howard to him, in December, 1783, of Bridgewater's mortgage. Only 15 years had elapsed from the date of that assignment until the death of the assignee. A foreclosure cannot therefore be presumed. Twenty years possession is necessary to raise the presumption of a foreclosure. (1 *Johns. Ch. R.* 335.) " Once a mortgage, always a mortgage," is a general principle of law, and no advantage gained by a mortgagee by being in possession, "or behind the back" of the party interested in the subject, is available. (1 *Johns. Ch. R.* 30. 2 *id.* 34.)

The assignment of the mortgage to Joseph Winter, vested in him all the title which Medcef Eden, senior, had in the premises at the time of his decease. Admitting, for the sake of the argument, that the proof established the execution of the assignment by *Joseph Eden* alone, he, as one of the executors of his father's will, was competent to assign the mortgage. The authority of executors is joint and several, and the acts done by any one of them, which relate either to the delivery, gift, sale, payment, possession or release of the testator's goods, are deemed the acts of all. (3 *Bacon's Abr. tit. Exrs. & Admrs. D. Rolle's Abr.* 924. *Comyn, tit. Admr. B.* 12, *Office of Executors,* 95. *Toller,* 359. *Dyer,* 23, b. 2 *Vesey, sen.* 267.)

Possession having followed the assignment, and continued since 1804 in the assignee, and those deriving title through

him down to the defendants, no interest remained in the devisees of *Medcef Eden, senior*, which could pass by the will of *Medcef Eden, junior*, to his widow, the lessor of the plaintiff, or to the other devisees named in the will. The estate of Medcef Eden, junior, if any, accrued in 1813, six years previous to his death, his *non-claim* during this lapse of time, and silence in relation to it whilst the persons in possession claiming a right to the premises were making expensive improvements on the same, barred him and those claiming under him from subsequently asserting their right. (1 *Johns. R.* 592.)

The devise of Medcef Eden, the younger, under which the lessors of the plaintiff claim title, is invalid by reason of the existing *adverse possession* against the devisor at the time of the making of his will, and at the time of his death. (*Gilbert on Devises*, 126, 134, 138, 145. *Plowd.* 485. *Cruise's Dig. tit. Devise, ch.* 3, *pl.* 28. 3 *Comyn's Dig.* 384, *tit. Devise.* 1 *Roberts on Wills*, 261, *n.* 8. 11 *Mod.* 128. *Fitzg.* 230. 1 *Mod.* 217. 8 *Vesey*, 283. 2 *Vent.* 340. 1 *Johns. C.* 33. 15 *Johns. R.* 343. 5 *Johns. Ch. R.* 545. 10 *Mass. R.* 131. 15 *Mass. R.* 113. *Fearne on Cont. Remainders*, 537. 1 *Blk. Rep.* 221, 251. 2 *Burr. R.* 1131. 3 *Coke*, 25. *Popham*, 89. 2 *Levinz.* 108. *Sheppard's Touch.* 411. 10 *Coke's R. Loines'* case, *Co. Litt. s.* 287. 3 *Burr.* 1488. 1 *Salk.* 237. 3 *Atk.* 336. 2 *Ball & Beatty*, 272. *Cowp.* 90, 217. 2 *Blk. Comm.* 194, *n.* 241, 378. 2 *Wooddeson's Lect.* 348. 1 *Vesey, junior*, 255. 8 *East*, 567, 1 *Taunt.* 604.)

The plaintiff ought not to have been allowed to avail himself of the testimony of *John Pelletreau* as to the merits of the cause, he being a party in interest, and having been called by the defendant solely for the purpose of proving a written instrument, to which his name appeared as a subscribing witness. When the plaintiff cross-examined him, he made the witness as much his own as if he had himself called him, and it was not allowable to prove facts by him on his cross-examination, which he would not have been permitted to prove by him on his direct examination. (2 *Caines*, 178. *Dickins' R.* 382, 595, 650.) The circuit judge erred in not

charging the jury, that upon the whole evidence in the cause, the plaintiffs in error were entitled to a verdict.

*M. Van Buren,* for defendants in error.    The plaintiff below shows Medcef Eden, the elder, in possession of the premises in question, in 1782, claiming in fee ; a continuance of that possession until 1798, when he died ; a devise in fee from him to his son Joseph ; and possession by Joseph under the will until 1805, making a period of *twenty-three years* that the property was held under the title now belonging to the lessors of the plaintiff.    Previous to the entry of Medcef Eden, the elder, John Bridgewater and wife were the owners of the property, from whom M. Eden, the elder, claimed to have purchased.    A conveyance was not produced, nor was it necessary to have been produced ; the possession under claim of right was sufficient to entitle the plaintiff to recover in a possessory action.    If it was not, the defendants should have made this a point of defence in the court below.    They did not, the only exception that was taken on this part of the case was, that Medcef Eden, the younger, was not *seized* of the premises at the time of the making of the will.

Every material consideration connected with the defence was matter of fact for the jury under the direction of the court, and by their verdict they have said, 1st, that the pretended title of Ware Branson, founded on the allegation that the premises in question were purchased by Bridgewater, with money belonging to his mother, or that she had become entitled to the same in right of survivorship, was an idle pretence, of which nothing had been proved.    2d. That they were satisfied, from the facts of the case, that the mortgage from Bridgewater to Howard, assigned to M. Eden, the elder, had been satisfied by the purchase of the premises, or retained as security for the title, it being wholly inconsistent with the acts of the parties, that the same was retained as a security for the payment of the money.    And 3d, that the bond from Bridgewater to Eden, and the endorsement on it, were either not satisfactorily proved, or were not inconsistent with the ownership in fee by M. Eden the elder.    The verdict was well

ALBANY,
Dec. 1828.

Varick
v.
Jackson.

warranted by the facts of the case; but whether so or not, was a question which, according to the established modes of legal proceeding, could be agitated only in the court below, on a motion for a new trial, on the ground of a verdict against evidence, or the weight of evidence; this court have nothing to do with it. The only questions here are, was the law properly decided by the circuit judge, and were the jury correctly instructed?

The general point now made, that the court ought to have directed the jury, that upon the whole case, the defendants below were entitled to a verdict, cannot avail. It is not pretended that the jury were misdirected. If the judge failed to charge them on a point of law which was thought material, it was the business of the defendants to have asked a direction upon the point, and if the judge refused or directed erroneously, the defendants were entitled to their bill of exceptions. The charge, which it is said ought to have been given, would have been a gross infraction of the rights of the jury.

The only real questions in the cause therefore, are those presented by the bill of exceptions. 1st. Was the will of Medcef Eden, the younger, rendered inoperative by the adverse possession existing at its date and at the time of his death? 2d. Had the plaintiff a right to examine John Pelletreau as a witness, upon the merits of the cause?

The first question, viz. *the capacity of Medcef, the younger, to devise*, will be considered in three points of view; 1st. By enquiring what was the law upon this subject as it existed in England in 1775, and how it is now considered; 2d. The effect and operation of our statute of wills; and 3d. The decisions of our own courts upon this point, in relation to this very title. And the endeavour will be made to shew, that in England a *devise* of property similarly situated would be valid under the English statute of wills, and the decisions of courts there; that if according to the law there, the decision would be otherwise, the difference between our statute and theirs is so material as to render the English decisions inapplicable here; and that this very question has been finally

decided in favor of the capacity to devise, as well in this court as in the supreme court of the United States, in this very controversy.

I. What is the rule in England? Here, as in England, the right to devise is given by statute. The language of our statute is, " *any* person having *any* estate of inheritance, &c. in *any* lands, tenements or hereditaments, may, at his own free will and pleasure, give and devise the same," &c. That the estate of Medcef Eden, after the death of Joseph, was *an estate of inheritance*, no one denies; if he had died *intestate*, leaving heirs, and they had come for the inheritance, no question would have been made as to their capacity to take; and as the statute declares that *any* estate of inheritance, held by any person in any lands, may be devised, the court, if they had nothing to do but to construe our own statute according to its plain letter and good sense, and to regard our own adjudications upon it, could have no possible difficulty upon the subject. But it is insisted that our legislature must be understood to have intended contrary to the express letter of the statute, or, in other words, that their intentions must fail of effect, because our statute is similar to the English statute of wills, and a construction has been given in the English courts, by which *such an estate of inheritance* as the one under consideration cannot be devised; and that our courts, from the highest to the lowest, are concluded by such construction. However unreasonable it may seem, that we should be concluded in the interpretation of our own statute by expositions of the English statute, given many centuries since, controuled, as will hereafter be seen, by reasons which have, in a great degree, lost their force in England and were never applicable here; whatever room there may be to question whether such expositions were a part of the common law intended to be adopted by us, still such has substantially been the rule that has hitherto governed our courts; and it is neither our intention nor our desire on the present occasion, to disturb it. All we ask is, that before we are concluded by the English rule, it be made satisfactorily to appear 1st. That the statutes are, in every material respect, alike; 2d. That the construction contended for is the established law of

England, and was so at the adoption of our state constitution.
If there is a failure in either respect, the law does not require,
and reason forbids the adoption by our courts of the construction contended for.

The supreme court, in deciding this cause, have not thought it necessary closely to compare the two statutes, and have therefore taken it for granted that they are alike. It will hereafter be shown that this concession is entirely gratuitous, but for the present it will be conceded, for the sake of the argument, that the statutes are alike. The question then is, would an estate, situated like the present, be devisable in England? It is contended by the plaintiffs in error that it would not, because, by the law of England, *a disseisee cannot devise the land of which he has been disseised.* It is no doubt true that it has frequently been ruled, but generally in very ancient times, that a disseisee is not within the statute, and therefore cannot devise the lands of which he has been disseised; but it is equally true, that this rule stands at this day greatly discredited, if not positively overruled. The supreme court, in the opinion pronounced in this case, have not adverted to the distinction between the different kinds of disseisin known to the law of England; a distinction which when taken and fully comprehended, relieves this particular case from all manner of difficulty. There are two kinds of disseisin, viz. *actual disseisin* and *disseisin by election.* To the former, an incapacity to devise has from a very early period been attached; to the latter never, either *here* or in *England.* It will in the sequel be seen, that the case before the court is at most but a *disseisin by election,* which does not interfere with the right to devise. All that was necessary, therefore, was to have established this point, and thus relieved the court from the consideration of the law applicable only to *disseisins in fact;* but the supreme court have considered the subject in a more extended sense, and have decided that the rule in England, that a disseisee of whatever character cannot devise, is, to say the least, not so far the established law there as to make it part of the common law here. After marking distinctly the different kinds of disseisin, and reserving the privilege of shewing hereafter its applicability to the case be-

fore the court, I will cursorily examine the general conclu-
sion of the supreme court, and endeavour to shew that their
opinion is well warranted by the evidences of the English
law now in existence.

A man is not necessarily *disseised*, because another *is in
possession* of his property. If a tenant for a term of years
holds over, and the landlord is driven to an ejectment to turn
him out, the landlord by such holding over is not disseised ;
it is only by acts of a peculiar character, that the relation of
disseisor and disseisee is brought about. Of *actual disseisin,*
viz. disseisin in despite of the owner, there are four kinds,
*three* by a stranger, and *one* by the tenant in possession con-
nected in privity of estate, as 1. Where a man enters upon
the immediate freeholder, and turns him out *by force*, this is
generally and emphatically called a disseisin. 2. Where a
stranger enters upon the *seisin in law*, which the heir takes
on the death of his ancestor, it is then called an *abatement.*
3. Where a similar entry is made upon the estate of the *re-
versioner* or *remainder-man*, when it is called an *intrusion ;* and
4. When a *discontinuance* or divesting of the estate in remain-
der or reversion is effected by the acts of the particular ten-
ant or tenant of the freehold, whether he be tenant in tail,
by the curtesy or for life. The consideration of the law rel-
ative to *abatements* and *intrusions* may be laid out of the case,
as it would tend only to perplex, there being no pretence that
either exist in this case ; and the inquiry will be, what amounts
to an actual disseisin, properly so called ? and what is a dis-
seisin by the act of the tenant in possession ? A disseisin in
fact is a *tortious expulsion* of the true owner ; it is an estate
gained by wrong and injury, and therein it differs from dis-
possession, which may be by right or wrong. A bare entry
on another, without an expulsion, makes such a seisin only
that the law will adjudge him in possession that has the right.
(6 *Johns. R.* 217, 218, *recognized in* 5 *Cowen*, 374. 1 *Burr.*
111. *Co. Litt. s.* 279.) A disseisin by the act of the ten-
ant in possession may take place by the destruction or deter-
mination, by alienation, surrender or otherwise of the partic-
ular estate upon which a remainder depends, before the con-
tingency happens upon which the estate is to vest, (1 *Co. R.*

130, 2 *Black. Comm.* 171,) or by the levying of a fine by a tenant for life, by which the estate of a reversioner or remainder-man may be defeated. (*Co. Litt.* 372.)

There is, however, another species of disseisin known to the law, relative to which our law books abound with cases, and which is frequently confounded with actual disseisin, viz. *disseisin by election,* which differs from actual disseisin, not only in the acts by which it is created, but also in the consequences which result from it. The origin and·character of this species of disseisin is as follows: The early remedies which the common law allowed for the recovery of a tenement wrongfully withheld, were *a writ of entry* and *a writ of right.* The former was used where the claimant had the *right of entry,* the latter where he had only the *mere right.* In both cases the processes were by original out of ·chancery, the proceedings under them were dilatory and attended with great niceties of practice. To remedy those inconveniences, a writ was invented by *Glanville,* chief justice, about the 22 Henry II. A. D. 1176, called the writ of assize. It was originally applicable only to cases of *abatement* and *novel* or recent disseisin. In its prosecution the plaintiff was not exposed to those dilatory pleas and proceedings which were allowed in other real actions. These considerations induced the legislature by various acts to extend that remedy to other injuries, and the courts by construction, for the sake of the remedy, soon extended it to almost every injury that could be done to corporeal as well as incorporeal hereditaments, if the plaintiff would admit himself to have been disseised. The superiority of the remedy over the old actions, induced parties to acknowledge themselves disseised, when in strictness they were not, and such disseisin was called a *disseisin by election,* to distinguish it from *actual disseisin.* The books are full of cases of disseisin of this description, and they are generally the disseisins of which the reports in assize treat.

Having thus marked the distinction between the two kinds of disseisin, I. shall proceed to an examination of the English law upon the question how far a *disseisee* is incapacitated to devise by force of the disseisin. In examining the cases upon this subject, it is important to bear in mind, that when the

books speak of a *disseisee* or a case constituting a disseisin, it does not necessarily follow that it is a disseisin in fact, but that it is generally otherwise, and without constantly keeping this distinction in view, we are liable to err. I have before stated that after the statute of wills, it was frequently ruled in England that a disseisee (always meaning a disseisee in fact) could not devise. This, it is admitted, has been the received law in England, but not a case can be found in which the precise point was presented and determined. The principal case relied upon is that of *Bunker* v. *Cook*, (1 *Salk.* 237,) more correctly reported in *Gilbert on Devises*, 126; but the true question decided in that case is only that a devise is not good unless the testator is the owner of the property at the time of the making of the will, the fact being in that case that the owner did not *acquire* the estate until eight years after the making of his will. It is conceded, too, that such has always been considered the law here, but no case has been decided in conformity to such received notion. It is true, in the case of *Smith* v. *Van Duzen*, (15 *Johns. R.* 345,) the court appeared to take it for granted that such was the law, but the determination of that question was not necessary to that cause, as the claimant was *heir* as well as devisee. In *Massachusetts* the law undoubtedly is, that an adverse possession renders a devise void, but the common law on this subject does not prevail there ; every entry there adverse to the title of the owner is a disseisin. It is not so here or in England.

Without other lights than those derived from unassisted reason, it would at this day be difficult to conceive how a rule, confessedly without reason, could have obtained, and for so long a time maintained itself in the English courts. Why a party out of possession and driven to his action, should not be permitted to grant his right to another, we can readily understand ; but why the estate should not be the subject of devise, is not so comprehensible. The owner could not so dispose of it for *maintenance*, unless he could also *die* at will. The idea that the devisee takes as a *purchaser*, and that as the law prohibits a grant, a purchase is forbidden, is too technical ; it is adhering to the letter of the rule at the

expense of public policy and common sense. But when we refer to the condition of England in relation to the *tenures* by which property was holden at the time when this construction was given to the statutes, all difficulty in accounting for the original establishment of the rule vanishes; and if we follow up the changes which have taken place in that country in relation to its tenures, we will also find why the rule has in later days fallen into such merited discredit. The reasons for the rule were altogether of *feudal origin.* ·The statutes of wills in England were passed in 1541 and 1543. The military tenures, and some of the more odious restrictions of tenures generally, were abolished in 1666, making a period of 123 years that the feudal law, in all its strictness, existed after the passage of the statutes of wills. It was in that period that the rule that a person disseised *could not devise,* notwithstanding the statutes of wills, obtained. The reasons are obvious. It was by the establishment of the feudal system that the right to devise was taken away. It existed among the *Saxons* in the broadest extent. (4 *Cruise's Dig. tit. Devise, ch.* 1, *sect.* 2.) By the feudal law, the tenant could not alien without the assent of his lord. This was an essential feature in the system to secure the *lord* a tenant, who could render the appropriate service. The right to devise was an inroad upon that system, and the statute of wills had therefore, for upwards of a century, to contend with its adversary system. The nature and character of a disseisin by the feudal law, was such as to induce the courts to make the case of a disseisee an exception from the statute. A disseisin was not complete without the assent of the lord publicly given, and a compliance with certain forms and ceremonies, such as investiture, oath, &c. &c. The same was the case with a disseisin effected by the alienation of the particular tenant previous to the statute of *uses,* the mode of conveyance being by feoffment, which required livery of seisin, and in case of land held by *knight service,* the assent of the lord, all of which were acts publicly done, and an *investiture* of the tenant in the seisin of the freehold made with the same solemnity as in the case of actual disseisin. The necessity of always having a visible tenant of the freehold to

render the military services ; the notoriety of the fact who acted as such ; the favor and countenance of the lord, given, it is said, because the disseisor had shewn himself the braver man, and consequently fitter for the lord's service by the expulsion of the previous tenant, led to the allowance of great privileges to the *disseisor*, and particularly to his innocent assignee. He could endow his wife, lease, assign, &c. All fines levied upon the estate, or other acts done, enured to his benefit, and the disseisee was stripped of all his rights except that of releasing to the disseisor. To this was added the incapacity on the part of the disseisee to *devise* ; and that right, with the others, accorded to the disseisor. Those interested in the maintenance of the feudal system, found less difficulty in supporting the exception, from the fact that before the statute, lands were in some places devisable by the *custom* which also excluded disseisees from the right, and it was plausible at least to maintain that the legislature did not mean to establish a new rule, but merely to extend an existing rule to the whole kingdom.

Such was the origin, and such the reasons for the rule in England. It was, at that day, a rule in strict conformity to her then political institutions. As long as it was deemed wise to maintain the feudal system in its ancient rigor, it was highly expedient at least to narrow the operation of the statute of wills, and continue the immunities allowed to the *de facto* freeholder, whether disseisor or not. But that condition of things, those reasons, and all the rights they gave, are buried with the years beyond the flood. By the statute 12 *Car*. 2, military tenures, with all their heavy appendages, were destroyed. By it the military and oppressive part of the feudal constitution was abolished, and all tenures in general reduced to one, viz. of *free and common socage*, a statute which, according to *Sir William Blackstone*, was a greater acquisition to the civil property of the kingdom than even *magna charta* itself, since that only pruned the excrescences that had grown out of the military tenures, and thereby preserved their vigor, whereas the statute of King Charles extirpated the whole, and demolished both root and branch. The reasons why this great change in the tenures of the

country should work a correspondent change in the conse-
quences of disseisin, are very apparent. The forms and cer-
emonies at once fell to the ground ; *investiture*, which be-
longed exclusively to the feudal system, was done away ;
and the *disseisor*, instead of receiving the public sanction of
his military lord, to whom he was commended by his brave-
ry, was looked upon as a mere private unsanctioned *tres-
passer*. By the ultimate operation of the statute of *uses*, the
conveyance by feoffment, requiring livery of seisin, fell into
disuse ; and by the abolition of the military tenures, the right
of alienation became completely untrammelled, so as neither
to require the assent of the lord to the conveyance of the
particular tenant, or subsequent investiture. Convey-
ances in that form, therefore, gradually fell into disuse.
But not only did disseisins loose their imposing charac-
ter in point of form, but the *substance*, with the reasons
by which they were sanctioned, were gone *forever*. The
whole doctrine of force, and the rights acquired by mil-
itary violence, were extinguished. Military rule, in relation
to private rights, ceased, and reason and justice took its
place. The policy which induced such favors to him who
had acquired his estate by violence, springing from the feu-
dal system, fell with it. Things, although they still continu-
ed to pass by the same name, and do so to this day, *changed*
their nature. A disseisor appeared in his true character, a
*naked, inexcusable wrong doer*, without any motive of state
policy remaining to palliate his violence.

Is it to be wondered at, that in this changed and improved
condition of things, a desire should have manifested itself, on
the English bench, to complete the great work which the le-
gislature had commenced, by shaking off, as fast and as far
as possible, the judicial shackles imposed by the feudal sys-
tem ? See, how changed the matter ! To constitute a dis-
seisin, it was necessary that the disseisor should have no right,
that is, in the old language of the law, his entry should not
be *congeable ;* that he should use actual violence in throwing
another man out of his estate, and usurping it himself ; and
to one thus trampling on right, and pleading nothing but
mere naked violence in his favor, the law is made to admin-

ter—what? privileges, immunities, rewards! and to the innocent victim of his wrongs, losses and incapacities. Under the feudal system, this might be, because it was a system founded in force and upheld by force. At this day, it would be monstrous, either in the view of policy or justice ; because the system which now prevails in relation to property is a system of right, sustained by reason.

These considerations were not long without their weight in England. From the abolition of the military tenures may be dated the decline of the rules which previously obtained in the English courts upon the statute of wills. Although strong intimations of dissatisfaction were previously given, the first full developement of the change wrought upon the character and consequences of disseisin was shewn in the justly celebrated opinion of Lord Mansfield, delivered shortly after he became chief justice of the king's bench, in the case of *Taylor, ex dem. Atkyns, v. Horde,* (1 *Burr.* 60, 112,) decided in 1757 ; in which, after discussing the doctrine of disseisin at large, he says, that he knew of no instance, except the special case of fines with proclamations, in which the true owner may not elect, (by pursuing a possessory remedy,) to be deemed as not having been disseised. Nothwithstanding there has been occasional hesitation, and some timidity, on the English bench, in following that uncommonly great man, still a careful examination of the juridical history of that country will shew that the victory which he acquired in favor of reason and justice, over technicality and form, has been tolerably well sustained to this day. The battle between a fair and liberal construction of the statute of wills, and a contracted and illiberal construction, has been fought in the English courts, not on this precise question, but on one entirely analogous. At the same time that it was held that a disseisee could not devise, it was also held, that *contingent* and *executory interests* were not devisable by the statute ; and so the law remained for a long time. After being several times controverted and questioned, the point was distinctly presented in *Roe* v. *Griffith,* (1 *W. Black. R.* 605,) decided in 1766, in which *Lord Mansfield,* speaking of another case said, " that he was prepared, with the concurrence of his brethren,

to have shewn that all contingent, springing and executory uses, when the person who is to take is certain, so that the same may be descendible, are also devisable ; that *descendible* and *devisable* are synonymous terms." In 1789, the question on the construction of the statute again came before the court, in the case of *Jones* v. *Roe*, (3 *T. R.* 88,) in which the old doctrine was fully exploded, and the true rule established. The point presented was, whether a possibility coupled with an interest was devisable. The counsel argued, that the statute of wills placed conveyances or grants by the parties in their lifetime, and wills on the same footing. The counsel on the other side were stopped by the court. *Lord Kenyon* observed, " if we consider the statute of wills, which first gave a power of disposing of real property by devise, it is matter of astonishment that this question should ever have arisen ; for it enables persons having any manors, lands, &c. to devise ; which must mean having an interest in the lands." *Ashurst*, J., says, " it is strange, that in former times, the courts should have been governed by such narrow reasoning when they were construing this act of parliament. For the plain meaning of the statute is, that every person who has a valuable *interest in lands* shall have the power of disposing of it by will." *Buller*, J., after remarking that the law was now settled, that an executory devise was descendible, adds, " if it be such an interest as is descendible, it seems strange to say that it is not also devisable. They must both be governed by the same principle. It was held to be descendible, because the person taking it has an interest in the lands which is known to the law, and will descend if the ancestor does not dispose of it ; then, if he has that interest, he has a right to dispose of it by his will." The reasons given by the judges embrace the case of a disseisee, for it cannot be disputed that the interest of a disseisee is descendible, and had the question now under consideration arisen in that case, the decision would have been the same.

The next important occasion upon which the construction of the English statute came before the English courts was in the case of *Goodright* v. *Forrester*, (8 *East*, 552,) in 1807, in which it was held by *Lord Ellenborough* that a *right of*

*entry* is not devisable by the English statute. His lordship expresses his regret that such is the rule of law, and recommends it as a question particularly fit for the consideration of the legislature, of applying the remedy, whereby the same rights of entry and action which belong to the heir may be extended to the devisee. It will, however, be observed, that though Lord Ellenborough uses the general terms *right of entry*, he must be understood as meaning only such a right of entry as was then before the court, which was a right of entry left in the owner after a *disseisin in fact*, effected by the *tortious alienation* of the tenant for life. The decision in that case could not, therefore, be held to controul this case, if the rule laid down in it was the established law of both countries. The case was put by the counsel and court on the ground of a *disseisin in fact*, and on the application of the old rule relative to disseisins of that character, as is most most manifest from the argument of *Preston*, counsel, in the exchequer chamber, when the subject had been more fully looked into. (1 *Taunton*, 586.)

The cases referred to by Lord Ellenborough as establishing the general rule that nothing can pass by *will* which cannot be *granted*, are *Corbet's case*, (1 *Co.* 85, *b.*;) *Butler & Baker's case*, (3 *Co.* 32, *a.*;) *Lord Mountjoy's case*, (*Godbolt*, 17;) and the opinion of *Lord Eldon*, in *The Attorney-General* v. *Vigor*, (8 *Vesey, Jun.* 282;) neither of which sustain the opinion. In *Corbet's* case the question arose upon a *deed*, and related to the validity of a settlement made by it, and it was in reference to another case that it was said, " for the construction of wills, this rule was taken by the justices in their arguments; that such an estate, which cannot, by the rules of the common law, be conveyed by act executed in his life, by advice of counsel learned in the law, such estate cannot be devised by the will of a man who is intended by law to be *inops consilii*." The case before the court related to the creation of an estate and perpetuities, and had nothing to do with the question of *disseisin*. From it Lord Ellenborough inferred, that out of that interest, in which, by act executed in a man's life, it is not possible to create any estate, no estate can be created by his will. This may have been true when Corbet's

case was decided, which was long before the establishment of executory devises, but was not the rule in 1807; for at that time an estate, so far as the creation of estates was prevented by the doctrine of perpetuities, could be created by will, though it could not be by deed; and the true inference therefore was, that as the law had been so far changed in favor of wills upon the subject of perpetuities, it was but reasonable there should be a correspondent change in relation to disseisins. In *Butler* and *Baker's* case the testator was seized of the premises jointly with his wife; during coverture he made his will, and it was held that he was not so *sole seized* as to enable him to dispose of the property under the statute by will; and that as he was not seized in *coparcenary* or *in common*, he did not come within the statute. By way of illustration, it was said that he could not have conveyed by deed longer than during coverture, and then the general words used in Corbet's case are substantially repeated: " without question, that which a man cannot dispose of by any act in his life, shall not be taken for any of his manors," &c. The incapacity to dispose did not arise from disseisin, or any question as to the state of the possession, but altogether from the quantity and quality of the estate he had in the premises, and therefore not applicable, even by analogy. In *Lord Montjoy's* case the inheritance devised was a franchise. It was objected, that it did not come within the statute, because it was not of *any yearly value*, which is the language of the act, and because it was not *devisable*, misprinted *divisible* in the report. As it could not be devised, and as the statute authorized a devise *of but two parts*, it did not come within the statute, and it was so held, and the general words referred to by *Lord Ellenborough* were used in reference to those objections. In the case of *The Attorney General* v. *Vigor*, the question was, whether a partition revoked a devise, and the effect of a disseisin was referred to by way of illustration. *Lord Eldon*, speaking of a disseisin against the will of the owner, recognizes the existence of the rule that such a disseisee could not devise. His lordship's observations are founded upon those of Chief Baron *Eyre* in *Cave* and *Holford*, (3 *Vesey, Jun.* 668,) in which, delivering an opinion

upon the question whether a conveyance by the devisor re-
voked a will, even if the estate again vested in him, in con-
sequence of the non-continuance of the same seisin from
the time of the will to the death, he, by way of illustration,
refers to the case of disseisin and no re-entry, which he says
would be a revocation.   The amount of the decision there-
fore is, that a *fine,* such as was levied in the case of *Goodright*
v. *Forrester,* viz. a fine *sur cognizance de droit come ceo, &c.*
with proclamations, the highest species of fine, which ac-
knowledges a feoffment to have been made publicly, *disseised*
the reversioner by devesting his estate, the same as a feoff-
ment would have done, and that *the old rule* that a disseisee
could not devise, was still in force and applied to the case.
This decision, however, was not acquiesced in.   A writ of
error was brought to the exchequer chamber, where the
cause was most ably argued in 1809.   (1 *Taunton,* 578.)
The court sustained the judgment below, but on another
point, viz. that the plaintiff was barred by five years nonclaim.
*Sir James Mansfield,* however, in delivering the opinion of
the court, adverting to the points argued and decided in the
king's bench, observed, " if the doctrine of estates arising by
*disseisin is as has been stated by the defendant's counsel,* we
must lament that the law is such.   Our ancestors got into
very odd notions on these subjects, and were induced by par-
ticular causes to make estates grow out of wrongful acts."
In the course of the argument of counsel, (page 604,) he
observed, " that it would be a singular construction at this
day to say, that upon the words of a statute which enacts that
persons having lands, &c. may devise them, he .who hath a
reversion in fee, the highest estate in lands, to be perfected
merely by entry, cannot devise them.   The policy of the old
law was the fear of oppression, arising by grants of disputa-
ble titles.   Where a man had a right of entry on which there
were doubts, or which he would not enforce himself, the law
said it should not be the subject of a grant ; but that does not
shew that it might not as well be *devised* as *descend,* for the
same reason of inconvenience does not apply."   Thus the
judges in England say all they can to discredit the rule, though
they do not expressly overrule the ancient decisions.   *Pres-*

*ton*, the counsel who argued for the old rule in *Goodright* v. *Forrester*, in his *Treatise on Estates*, 1 *vol. p.* 20, though he abides by the opinion which he attempted to support in his argument, worthy of all consideration, admits that there is no express decision to support the rule for which he contended, but he states it as the better opinion.

Can it therefore with reason be contended, that the rule *that a disseisee in fact cannot devise*, is at this day, or was, at the adoption of our constitution, so far the settled law of England as to make it obligatory upon our judicial tribunals? I think not; but if it was, how could that rule affect this case? Was there a *disseisin in fact* here? If so, when and how? There was not, and I pledge myself to shew to entire demonstration that there is not the slightest pretence for the assumption. The title of the lessors of the plaintiff is made up of the estates of Medcef Eden the elder, Joseph his son, and Medcef the last devisor. Which of them was disseised? Medcef, the father, continued in the uninterrupted possession of the premises, from the close of the revolutionary war until his death. He died seized, leaving the property by devise to his son Joseph upon certain conditions. How was Joseph disseised? The clandestine entry of Ware Branson who had no title, and the execution of the deed by him in the garret, may be laid out of the case. Joseph Winter became possessed of the premises in 1805. He entered under the conveyance by Joseph of all his interest, as expressed in the assignment of the mortgage, and such entry destroys all pretence for saying that Joseph *was disseised.* When was Medcef Eden, the last devisor, in a situation to be *disseised?* Before the death of his brother he had only a *contingent interest*, which was not the subject of disseisin, for the very obvious reason that he had *no seisin to be disseised of.* When there is a vested remainder or certain reversion carved out of a fee and outstanding, the remainder-man or reversioner is in the seisin of the fee. His estate with that of the particular tenant forming the fee simple, being an estate thus *vested*, it may be *devested* by disseisin, but a mere contingent interest never having vested, cannot be devested. By the death of Joseph in 1813, without issue, the contingent interest of Medcef Eden,

the younger, became a vested estate ; and then and not before he acquired *a seisin of the premises*, of which he could be disseised.    Since 1813, what has been done to disseise him ? *Literally nothing.* All the conveyances were previous to 1810, and since 1813 there has been a simple continuance of a possession *lawfully* acquired.

But suppose that the estate of Medcef Eden, the younger, was liable to have been disseised previous to 1813, the deeds that were given could not have that effect on any principle known to our law, because they were not *tortious* as to him. He had no right to complain of such conveyances.    Joseph had a fee which he might well grant as such, and those deriving title from him might do the same, without prejudice to any one ; for the contingency upon the happening of which Medcef's estate would vest, might never happen.    Again, all the deeds were conveyances under the statute of uses, operating without mutation of possession, and nothing is better settled in the law, than that such conveyances neither divest nor displace any future estate. If, therefore, it were true, that by the law of England in force here, a disseisee cannot devise, that rule cannot touch us, because we have not been disseised.    For the distinctions between *tortious* and *innocent* conveyances, see 1 *Institutes,* 42 *a,* 230 *b,* 251, 287 *b,* 327 *b,* *Litt. s.* 415, 416, 609, 610, 611, 620, *Finch's Law,* 135, 1 *Co. R.* 120.

In the case of *Jackson* v. *Brinckerhoff,* (3 *Johns. C.* 104,) it was said by one of the justices of the supreme court, "that no party is technically estopped by a conveyance founded on the statute of uses.    A conveyance in pursuance of that statute, operates upon *the actual right of the grantor* only.    It transfers that right, *whatever it may be,* when the party is in a capacity to convey, and it extends no farther.    It is not subject to all the rules built on feudal principles, which apply to conveyances at common law.    Thus it is held not to work any discontinuance or forfeiture, as conveyances by particular tenants in certain cases are held to do ; and from the principle that its operation is commensurate with the actual right of the party, and is governed by it, I think it follows that it cannot be affected by the doctrine of estoppels.    It

was accordingly so held at an early period by *Saunders*, J. (*Freem. Rep.* 475, case 651.)"

What then is our condition? It is said we are out of possession, and are driven to our action upon our right of entry. The answer is plain. Ours is at most *a disseisin by election*, founded on a wrongful holding of a possession acquired by right, of which there are innumerable cases, and which are entirely different from actual disseisin, as well in their creation as consequences. The supreme court give to the possession of the defendants its true character, in the opinion pronounced in the case of *Lion* v. *Burtiss*, (20 *Johns. R.* 491.) "The continuance of the bank in possession after the death of Joseph Eden, *was not a disseisin, but a mere deforcement*, which is defined to be the holding of any lands or tenements to which another person hath right. And it is distinguished from abatement, intrusion, disseisin or a discontinuance in this, that it is only such a detainer of the freehold from him that hath the right of property, but never had any possession under that right, as falls within none of the injuries which belong to the other classes." The rule is more fully explained in 3 *Black. Comm.* 172, 3. This species of deforcement is dispossession or disseisin, at the election and by the consent of the owner, with a view to the remedy by ejectment or *assize*. By making his will, Medcef Eden, the younger, *made his election* not to be disseised if that were necessary, but it was not, for neither in England or here was an incapacity to devise attached to such a dispossession. In 9 *Viner*, 103, *title Disseisin*, the making of a lease by the tenant, was held to be a disseisin at election, and not a disseisin in fact, and the owner was not thereby incapacitated to devise. In *Jackson* v. *Rogers*, (1 *Johns. C.* 33,) this very distinction was taken. There the possession was adverse at the making of the will, yet a lease executed by the tenant at will, was held to be a disseisin only at the election of the party, and the will was adjudged to be operative. The remark made by *Spencer*, J., in *Smith* v. *Van Duzen*, (15 *Johns. R.* 345,) that the adverse possession in that case at the time of the making of the will invalidated the devise, was not called for, as the de-

cision did not turn upon that point, nor had the question been agitated on the argument of the case.

II. Our statute of wills and the English statutes on the same subject are not alike. The admission of the supreme court that there is no material difference between them was gratuitous, and probably made from a conviction that the rules of construction under the English statutes clearly and definitely settled, would not interfere with the construction which, in their judgment, our statute manifestly requires. The strongest reasons exist why the English construction should not be adopted here, if our courts can avoid doing so without a positive disregard of authority. Among those reasons are, the very remote period in which that construction first obtained ; the inapplicability of the considerations which unavoidably entered into the decisions upon the subject, derived from the principles of the feudal system ; the dissatisfaction, to say the least of it, which prevails in relation to the rule in England ; the difference in the tenures by which property is held here and in England : lands in a great part of this state being held in *pure allodium ; there* the prevailing tenure being *free and common socage*, which, although of the mildest form, is still a branch of the feudal system ; hence some propriety in referring to feudal analogies, which here are in most cases inapplicable ; and the hardship of submitting to rules of construction incorporated into the common law, adopted by our constitution where it is unavoidable, imposes upon us the obligation to emancipate ourselves as far and as fast as practicable, where doubt exists as to what is the law.

Our statute is as general as the English language can make it : " Any person having *any* estate of inheritance, either in severalty, in coparcenary, or in common, in *any* lands, tenements or hereditaments, may, at his own free will and pleasure, give or devise the same," &c. (1 *R. L.* 364.) No words could be more explicit to embrace the interest in question. The statute refers exclusively to the *quantity of interest*, viz. an estate of inheritance. There is no limitation as to the time of enjoyment ; whether the estate be in possession or expectancy, it is alike devisable. Very different is the

ALBANY,
Dec. 1828.

Varick
v.
Jackson.

language of the English statute. The words of the first stat-
ute of wills in England, 32 *Hen.* 8. *c.* 1, are "*having* man-
ors, lands, tenements or *hereditaments*, &c.," and of the se-
cond, 34 and 35 *Hen.* 8. *ch.* 5, *s.* 4, "*having* a *sole* estate
or *interest in fee simple* of and in any manors, lands, tene-
ments, rents or other heraditaments, in *possession, reversion,*
or *remainder.*" Much stress was laid on the word *having* in
the first statute. It was said, and with great plausibility, that
a testator could not *have the lands* when another *had them,*
and particularly when another had been *invested* in the seisin
of them according to the solemnities of the feudal system.
The second statute was therefore enacted to cure those de-
fects. Its passage is evidence of the struggle between the
legislature and the feudal principles, which had taken deep
root in the system of jurisprudence, and by it *any interest in
lands* was declared to be devisable ; but still there was a lim-
itation : the interest was required to be in *possession, rever-
sion* or *remainder.* These are technical words, and each has
a precise and established legal meaning. A man who has a
*present* right to lands, the possession of which is in his adver-
sary, cannot be said to have an estate, either in possession,
reversion or remainder. (1 *Black. Comm.* 163.) If either,
it is an estate in possession, which, in strictness, however, it
is not now, and much less could it have been so regarded
during the continuance of the military tenures, when the dis-
seisor had been solemnly invested in the possession. These
objections could only be got over in England, by applying a
liberal and equitable construction to the statute, so as to give
effect to the design and intent of the legislature, and thus
they will be surmounted when again the question is distinct-
ly presented there. The venerated men who framed our
statute of wills, who were lawyers of the first respectability,
and conusant of the whole matter, did all that was necessary
to prevent any difficulty on the subject. Knowing that no
possible reason could exist why lands that were *descendible*
should not also be *devisable,* they omitted the limitation con-
tained in the English statute, and substituted the most gene-
ral words that could be used to allow the statute to operate
in its most enlarged sense. The limitation was not omitted

by accident, but by design. This court are now called up-
on to *undo* what they have done, to reject the plain meaning
of the words incorporated into the statute, and to adopt for
their guide certain musty and obsolete *dictas* of the sixteenth
century, conceded on all hands to have become senseless,
whatever respect they might once have been entitled to.

The construction we contend for, is sanctioned by the le-
gislature in their enactments upon other portions of the law
of property, and by our courts in their expositions of those
laws. The language of the statute of *descents*, (1 *R. L.* 52,)
is, "where any person shall die seised of any lands, &c. with-
out devising the same in due form of law, the inheritance
shall descend," &c. in the manner pointed out thereby. The
words *without devising the same*, taken in connection with the
generality of the provision, extending as it does to estates
whether in possession or not, shew that the legislature con-
sidered that *devisable* which was *descendible*. The words *die
seised*, in the statute of descents, are much stronger as appli-
ed to this case, than the words *having an estate of inheritance*,
in the statute of wills. If the construction contended for by
the plaintiffs in error should prevail, the consequence would
be the introduction of the common law rules of descent ; in
all cases where property was held adversely at the death of
the ancestor, the eldest son would inherit to the exclusion of
his brothers and sisters, and yet the uniform decisions of our
courts have been directly the reverse. Why has this been
so ? There certainly is no reason that the construction giv-
en to the one statute should be more liberal than that given
to the other. Look at the consequences of establishing this
construction upon our law of descents. It would overturn
half the estates which have descended for nearly half a cen-
tury. Unless one rule is to prevail as to one statute, and an-
other and different rule as to another statute similar in its
terms and objects, the construction contended for on the
other side will not be adopted. The same would be the ef-
fect upon our statute relative to judgments and executions,
which authorizes the sale of the lands and tenements *whereof
the debtor is seized* on the day of the docketing of the judg-
ment against him, and yet was it ever pretended that the in-

terest of a debtor could not be sold simply because he was out of possession? Was such the law, easy indeed would it be for a debtor to prevent the sale of his property.

III. The question now in controversy has been decided. It was necessarily involved in the determination made in the causes of *Anderson* v. *Jackson*, (16 *Johns. R.* 382,) and *Wilkes* v. *Lion*, (2 *Cowen*, 333.)  In the report of the latter case, I am represented as contending that the question arising upon the adverse possession at the making of the will of Medcef Eden, the younger, could not be called in question in that case.   The opposing counsel, however, thought differently, and expressly made it a point that the will was inoperative, the testator not being seized of the premises devised at the time of his death, and cited numerous cases in support of the position, (2 *Cowen*, 355 ;) and it seems from a decision of the supreme court U. S., (1 *Peters' R.* 570,) that the counsel were right in supposing the question did arise in that cause.   The necessity of passing upon it, happened from principles applicable to the action of ejectment. On the part of the plaintiff, title had been shewn in Medcef Eden, junior.   He died between the commencement of the suit and the trial, and a nonsuit was claimed on the ground that his title had ceased, and at all events that the plaintiff could recover damages only, and not the term.   The plaintiff claimed to recover on the demise of Medcef Eden, junior, for the benefit of his devisees.   Formerly it was contended and held that there could not be a recovery on the demise of a dead lessor ; but it was settled in this court that his representatives might recover the term, if the title was a subsisting one, and the persons claiming the benefit of the recovery were entitled to it.   We were not heirs.   Indeed, it was proved that the heirs of Medcef Eden were *aliens*, and therefore if we did not take, the estate escheated ; and it was urged that we could not take by reason of the adverse possession.   That point was therefore necessarily adjudged by the court in giving judgment for the plaintiff; and such was the opinion of the supreme court of the U. S. in *Jackson* v. *Waring*, (1 *Peters' R.* 570,) where that court not only sanctions this decision, but expressly say that the doctrine of our

supreme court in *Doe* v. *Thompson*, (5 *Cowen*, 371,) that a disseisin upon which a descent may be cast so as *to toll the right of entry* must be *tortious* and *forcible*, warrants the conclusion that a similar disseisin at least is necessary to prevent the operation of a devise.

If it is objected that those cases do not apply, because there the defendants claimed under Joseph Eden, we answer that in point of fact, they do here also claim under title derived from him.   They cannot claim under Ware Branson, for there is no proof that he had title, and whatever right was acquired from him was abandoned by taking the assignment of Bridgewater's mortgage and foreclosing the same.   If Ware Branson had title, Winter acquired from him the same title he derived under the mortgage ; and it is not pretended that the foreclosure was necessary to cut off outstanding incumbrances, or that the mortgage was foreclosed to collect a debt.   The claim of the defendants was therefore under Joseph Eden.   The deed from him to Winter was a conveyance in fee, reciting the devise in fee to him from his father.   It is not, however, for the defendants in error to explain the motives of Winter in the foreclosure of the mortgage.   It may have been with a view to this question.   It may have been in consequence of some imperfection in the conveyance from Bridgewater and wife to Medcef Eden, the elder.   The jury were satisfied that the mortgage was extinguished, and Winter used it for the purpose for which Medcef Eden, senior, doubtless took an assignment to secure a title, if necessary, otherwise acquired.   But suppose the plaintiffs in error do not claim under our title, how does it affect the case ?   Nothing could be done in prejudice of our rights previous to 1813.   Since then nothing has been done that could operate as a disseisin.   If the objection is, that Medcef Eden, the younger, could not devise, being out of possession when he made his will and died, without reference to the fact of how he became so, the question is directly decided in the two cases on which we rely.   The court held, in those cases, that an adverse possession unaccompanied by a disseisin, did not prevent the operation of a devise, and they are called upon now to say the same thing, and no more.

As to the remaining point in the cause, the counsel said he should rely upon the reasons offered by the supreme court in support of the decision of the circuit judge, allowing the examination of John Pelletreau on the merits.

*A. Burr*, on the same side, declined arguing the principal question discussed by his associate counsel, and only made a few remarks upon the question of the examination of the witness, John Pelletreau. He said that the witness being sworn *in chief*, was bound to testify without examination, and cited 1 *Esp. Nisi Prius C.* 355, and 4 *id.* 67.

*A. Van Vechten*, for plaintiffs in error, in reply. The estate of Medcef Eden, the elder, was not such that he could make a valid executory devise to his son Medcef Eden, jun. He had only a mortgage interest in the premises in question. His entry, which was after the evacuation of New-York, viz. in November, 1783, was not shewn to have been under any other title than that derived from the assignment of Bridgewater's mortgage. This did not give him the fee, which could be obtained only by the extinguishment of the right of redemption. There is no pretence of a foreclosure by him, nor is any fact or circumstance shewn to warrant the presumption of a conveyance to him. Even length of time cannot be alleged in favor of the presumption ; as from 1783, when he entered, until 1798, when he made his will and died, only 15 years had elapsed. Taking the assignment of the mortgage, he admitted the fee to be in Bridgewater. His possession was consistent with his character as assignee of the mortgage. The evidence that he claimed a fee in the land is of a doubtful complexion ; but admitting such claim to be fully shewn, the fact of a naked claim does not confer a fee.

The continuance of the possession by Joseph Eden, after the decease of his father until 1804, does not help the lessors of the plaintiff. It was a continuance of the possession under the mortgage interest. Such was the view entertained by Joseph himself, evidenced by his assignment of the mortgage. The fact of his treating it as an open mortgage, rebutted the presumption of payment. (9 *Johns. R.* 606.)

ALBANY,
Dec. 1828.

Varick
v.
Jackson.

The assignment to Winter did not convey a fee. Its object was to transfer the mortgage, and the instrument is not susceptible of any other construction, according to the settled rules of law ; the mortgage being the subject matter of contract between the parties. Be that, however, as it may, the interest of the executory devisee can neither be benefitted nor injured by the acts of the executor of Medcef Eden the elder. The executory devisee can take only such estate as the testator had at the making of the will.

In March, 1805, the mortgage of Bridgewater was forecloed by a sale under the statute. A sale by virtue of a power is equivalent to a foreclosure and sale under a decree of chancery, and cannot be defeated to the prejudice of a *bona fide* purchaser. (10 *Johns. R.* 185.) Medcef Eden, the younger, after the accruing of his estate in 1813, acquiesced in the sale until his death, in 1819, and the lessors of the plaintiff made no claim until 1822. Medcef Eden, the younger, was chargeable with notice. He interposed no claim ; he permitted the purchase, and the expenditure of large sums of money in the improvement of the estate, and yet was silent. The lessors of the plaintiff are also concluded by their acquiescence. By the will of Medcef Eden, jun. a *testamentary legal adviser was named, who applied to Col.* Varick to assist in resisting claims upon the estate ; and by such application, the title of Col. Varick was admitted. The acquiescence of Medcef Eden, jun. and of the lessors of the plaintiff, in the title of the purchasers under the mortgage sale, and permitting valuable and permanent improvements to be made by them, without an assertion of their right, was a fraud upon the purchasers, by reason whereof their claim to the premises is precluded. (2 *Johns. R.* 573.) Since the mortgage sale in 1805, until the commencement of this suit in 1822, the premises have been in the *actual* possession of the purchasers, claiming and exercising exclusive ownership.

A devise is a mode of conveyance created and authorized by statute, and the devisee takes as a *purchaser*. Any person having an estate of inheritance may devise. *Having* means a saleable, disposable interest. Can a person, having an interest in lands, the possession of which is held adverse

to his right, *convey* the same? Surely not; for he has only a right of action, which is not the subject of conveyance, and a devise is a conveyance by way of appointment. (*Cowp.* 90.) The uniform rule in England is, that to make a devise valid, the devisor must have both the right and the possession. All conveyances, whether by devise or otherwise, where the property is held adversely, are void. It is not to be presumed that the statute of wills meant to make a conveyance by devise an exception. According to its literal terms, the statute of champerty and maintenance would be repealed. It authorizes any person, having any estate of inheritance, to *give* or *devise* the same by his last will and testament, *or by any other act.* The two statutes are to be construed in *pari materia*; and it never has been pretended that the statute of wills authorized the conveyance of property forbidden by the statute of champerty. The statute of champerty enacts that no person shall, *by any ways or means*, procure any pretended right or title. (1 *R. L.* 173.) What is a pretended title? A title disputable by the fact of the possession being severed from the right. The statute affects as well him who receives as him who conveys the title.

It is conceded on the other side, that until of late years, the opinions, if not the decisions upon this subject, have uniformly been, that property situated like the present was not devisable. But the court are invoked to untrammel the law, by declaring it to be what it never has been understood to be. Does not the call admit that the court is trammelled, or rather bound, by the settled and uniform received opinion on the subject? If so, the maxim of *communis error facit jus* applies; and it is better to confirm such received opinion than to set afloat the titles to property, and to adopt a new rule by which the rights of parties are to be governed.

No argument can be deduced from the law of descent in favor of the *devisability* of property held adversely. The dangers which it was the policy of the law of maintenance to guard against cannot arise in cases of descent. Nor does the judicial sale of property under execution come within the mischief of the statute. It is said no evils will arise from permitting the transmission of property by devise. Will it

not enable a man to convey his property to another, who will prosecute suits for pretended rights? Though the judges in England have censured their predecessors, they have not overruled their decisions; though they have shown their willingness, they have not dared to overturn the law.

In every case of ouster, where the owner is kept out, a disseisin has taken place, so as to avoid a devise. With the feudal times, is gone the feudal mode of disseisin. It is said there can be no disseisin without force, or what is equivalent thereto. If force is necessary, was not sufficient shewn in this case? Was not the tearing down of the buildings, and the building up of others, acts of ownership sufficiently indicative of the exercise of right, in hostility to the former possessor? Were not these acts equivalent to force? A possession, acquired not in subserviency to the former owner, continued for a sufficient length of time, will bar the title; and if so, why is not the right to devise gone? In *writs of right*, no count can be found in the name of the *devisee*. The reason assigned is, that the devisee cannot bring his action. The reason why a disseisee cannot devise is not to be traced to the feudal system, nor does it depend upon it. It is to be found in the principle, that a man cannot devise that which he has not at the date of his conveyance; and a devise being in the nature of a conveyance, by appointment, it is void when the estate is held adversely. (*Cowper*, 90.) The rule did not grow out of the statute of wills; for it existed previous to that statute, based upon principles of public policy. Property held adversely is not devisable, though it may be descendible; because the law prohibits a conveyance of property thus circumstanced. The reason of the rule is the prevention of litigation and the quieting of titles, recognized by the common law, and enforced by legislative enactment. Our statute of wills was enacted in 1787, and the act to prevent champerty and maintenance, in 1788. Of course, the latter was passed in reference to the former. It prohibits a conveyance by devise, as well as by any other ways or means; and subjects the buyer or *taker* of any pretended right or title to lands to a forfeiture of their value, unless the person conveying, or his ancestors, have been in posses-

sion within one year. The words, "by any ways or means," are broad enough to comprehend devises. The penalty imposed declares the act illegal, and if illegal, it is prohibited in law ; for an act conveying property cannot be good and operative which subjects a party to punishment. The proviso allowing the person in possession to obtain the pretended right confirms this construction.

The uniform rule, and the common received opinion of courts, judges, lawyers and the community, that a disseisee cannot devise, ought to establish the law. If there is no good reason for the distinction why property which is descendible should not be devisable, let the remedy be applied by the legislature, to whom Lord Ellenborough referred the question, in *Goodright* v. *Forrester*, (8 *East*, 568.) Our legislature have abolished the distinction, in their late revision of the laws, and after the 1st January, 1830, such will be the law of the land ; but until then, the old rule must prevail. The act of the legislature is not *declaratory*, but a *new enactment*, and therefore a legislative exposition of what is now the law.

As to the pretended difference between our statute and the English statute of wills, it is matter of astonishment that for forty years the discovery has not been made. The words of the first English statute of wills were sufficiently comprehensive to give the right to dispose of the legal title. The second statute limited the right, and confined the devise to property of which the testator was *in possession*, either by himself or by the tenant of the particular estate. And although by our statute a general power is given to devise any estate of inheritance, this power can be exercised only in conformity to the general rules of law. The words give a general name to the cases specified in the English statute. They are satisfied as descriptive of the quality of the estate, without reference to its situation, and without interfering with the provisions of other statutes.

The case is not *res judicata*. The question here presented, that Medcef Eden, the elder, had not such an estate as could be conveyed by executory devise, has never before been raised.

ALBANY,
Dec. 1828.

Varick
v.
Jackson.

The circuit judge erred in allowing the examination of John Pelletreau on the merits. He was directly interested in the event of the suit ; and because he was called by the defendant, *ex necessitate*, to prove the execution of a paper to which his name appeared as a subscribing witness, the opposite party had no right to examine him in chief. A party interested, who is a subscribing witness to an instrument, may, and in many cases, must be called. The necessity of the case required he should be called. He might have been compelled, by a bill of discovery, to answer, and why should he not be examined *viva voce ?*

THE CHANCELOR. There was sufficient evidence in this case to warrant the jury in finding, that the title to the premises in question was in Medcef Eden the elder, at the time he made his will, and at the time of his death. He was in possession of the premises by his tenants, and claiming title thereto, immediately after the revolution ; and such possession was continued under him and his devisee until 1805. This was sufficient evidence of ownership to entitle the plaintiff in the court below to recover against any person who could not show a better title. The jury were also justified in finding that the mortgage was not a valid and subsisting incumbrance on the premises at the time it was assigned to Winter, in September, 1804.

All these questions were properly submitted to the jury as matters of fact, and were passed upon by them. They could not have found a verdict for the plaintiff in ejectment, without deciding that the alleged assignment of the mortgage to Winter was a forgery, so far as respected Medcef Eden *the younger ;* because that assignment also contained a valid conveyance of all his estate in the premises. If the jury erred on that subject, the remedy was by an application for a new trial ; and the party may still recover back the premises in a new action.

John Pelletreau was directly interested to have the lessors of the plaintiff recover, and therefore could not originally have been called by them as a witness ; but being called and examined by the other party as to a particular fact, the

court decided he might be examined by the plaintiffs' counsel generally. I am not aware of any case in which a party is compelled to call a person as a witness who is directly interested against him. If the subscribing witness to an instrument is interested at the trial, so that he cannot be examined, secondary evidence may be admitted. (*Swire* v. *Bell,* 5 *Term Rep.* 371.) It cannot, therefore, be necessary for a party to call a witness who is interested against him, and in whose veracity he has no confidence. But if he elects to call such a witness, it is an admission of his credibility, and the other party may examine him generally. Cases may occur, where suits are brought for distinct causes of action, in which a witness may be interested in one part of the controversy only, and not liable for the costs of either. It is the constant practice of the court of chancery in such cases, to permit the person to be examined as to that part of the controversy in which he has no interest. If such a case should occur in a court of common law, such court probably would permit him to be sworn specially, on the application of a party who could not call him as a witness generally. The defendants in the ejectment having called Pelletreau to testify in relation to matters in which they knew his interest was against them, I think they were precluded from objecting to his examination by the other party.

But the principal question in this cause is as to the validity of the devise of Medcef Eden the younger. Two kinds of disseisin are mentioned in the English law books. The one was a disseisin in fact, which actually changed and divested the seisin of the original owner of the freehold, and deprived him of all right in relation thereto, except the mere right of entry and of property ; and which, under certain circumstances, was still further reduced to a mere right of action, the right of entry being lost.

By this species of disseisin the wrong doer acquired a fee simple, and the actual seisin of the property, together with nearly all the rights of the real owner ; and all estates depending on the original seisin were divested or displaced. The other kind of disseisin was called disseisin by election, because the owner might elect to consider himself disseised

for the sake of the remedy by action of *novel disseisin ;* but if he did not elect to consider himself disseised, the freehold was not divested, but still continued in him. (*Blenden* v. *Baugh, Cro. Car.* 302.)

Whether, under the British statutes since the abolition of military tenures, there is any disseisin which will deprive the owner of property of the power of devising the same, is a question which does not arise under the facts of this case. The *statute* 34 *and* 35 *Hen.* 8, (*c.* 5, *sec.* 4,) authorizes any person having a sole estate or *interest* in fee simple of and in any manors, lands, tenements, rents or other hereditaments in possession, reversion or remainder, to devise the same. And in *Goodright* v. *Forrester,* (8 *East's Rep.* 567,) Lord Ellenborough appears to have put some stress on the words *in possession, reversion or remainder,* as words of restriction or limitation. Where the true owner is absolutely divested of his estate, and the same is vested in the disseisor by a disseisin in fact, according to the ancient doctrines of the feudal law, especially if the right of entry is taken away so as to reduce the owner's claim to a *mere right,* it may not be correct to call it *an estate or interest in possession,* in the words of the British statute, although it is still an hereditament and descendible. Our statute of wills provides, " that any person having any estate of inheritance either in severalty, in coparcenary, or in common, in any lands, tenements or hereditaments, may, at his own free will and pleasure, give or devise the same," &c. (*Sess.* 36, *ch.* 23, *sec.* 1.) It is hardly possible, in broader and more explicit terms, to give a general power to dispose of any property, right or interest in real estate by will, whether the same is a vested freehold in possession of the testator or a mere descendible hereditament or interest therein, in respect to which, he had only a right of entry, or a mere right of action. But as the legislature, in the late revision, have settled the rule of property as to all future devises, and being satisfied there was no actual disseisin of the estate of Medcef Eden the younger proved on the trial, I think it is unnecessary for me to express any opinion as to the power of a disseisee to devise, either under the British statute of wills or our own.

Disseisin *in fact* and disseisin *by election* have been so frequently confounded, that, in examining the *dicta* of judges, it is sometimes difficult to understand to which species of disseisin they allude, without referring particularly to the facts of the case which they had under consideration at the time such *dicta* were delivered. But, by a careful examination of the authorities, it will be found that there could be no disseisin in fact, except by the wrongful entry of a person claiming the freehold, and an actual ouster or expulsion of the true owner, or by some other act which was tantamount; such as a common law conveyance, with livery of seisin, by a person actually seized of an estate of freehold in the premises; or some one lawfully in possession representing the freeholder, (1 *Instit.* 330, *C. note* 1;) or by a common recovery, in which there was a judgment for the freehold, and an actual delivery of seisin by the execution, or by levying a fine, which is an acknowledgment of a feoffment of record. (2 *Bl. Com.* 348. *Co. Litt.* 330, *C. note* 1. *Doe* v. *Thompson,* 5 *Cowen's Rep.* 371. *Smith* v. *Burtis,* 6 *Johns. Rep.* 197.)

In this case there was no expulsion of the tenant of the freehold, and Medcef Eden the younger did no act which could possibly be construed into an election to consider himself disseised. When Boyd took possession of the premises in 1805, it was during the life of Joseph Eden, and of course before the happening of the contingency which afterwards divested the estate acquired under the conveyances of the first of September, 1804, and the first of May, 1805. By those conveyances Boyd acquired all the right of Joseph Eden, which was an estate in fee, subject, however, to be defeated by the death of Joseph without issue, during the lifetime of Medcef. His entry, therefore, was congeable, and divested no estate. None of the conveyances executed during the life of Joseph Eden were common law conveyances, with livery of seisin, and of course divested no rights but those of the grantors. By the death of Joseph Eden in 1813, the title vested in Medcef; and the holding over of the person in possession, after the termination of his estate in the premises, could not be a disseisin of the rightful owner. After that

time, the rights of the parties were not altered previous to the death of Medcef Eden. There was then nothing to prevent the operation of his will, unless the bare holding over of a tenant for life, after the determination of his estate, and claiming the fee, can have that effect.

There is no case in the English books, where it has been holden that a mere adverse possession, not amounting to a disseisin, is sufficient to prevent the owner from devising. And in *Goodright* v. *Forrester*, (1 *Taunton*, 604, 613,) Mansfield, C. J. doubts whether even a technical disseisin has that effect at the present day. So far as there is any authority on the subject in our own reports, it is in favor of the right to devise, notwithstanding a mere adverse possession, (*Jackson* v. *Rodgers*, 1 *Johns. C.* 33 ;) and such I believe has been the general understanding of the profession in this state. The common opinion as to the effect of a technical or actual disseisin has probably been different.

The statute against champerty has no application to this subject. That is only in affirmance of the common law. It superadds penalties, but does not alter the legal effect of the sale of a pretended title. The penalties inflicted by that statute are not applicable to the case of a devisor or devisee. Admitting the will to be in the nature of a conveyance, it could only take effect upon the death of the testator, when it would be too late to enforce the penalty against him ; and it would be a singular proceeding to attempt to punish the devisee for the act of a devisor. He may refuse to take a conveyance, but I am not aware that he can prevent the operation of an absolute devise, any more than an heir at law can prevent a descent. Besides, such a construction of the statute might frequently cast the property, by descent, upon the person who was wrongfully withholding the possession from the true owner.

It has frequently been decided that judicial sales and assignments under the insolvent acts, or proceedings in bankruptcy, are not within the operation of that statute ; and I can see no reasons why it should be applied to a devise, which are not equally applicable to such sales and assignments. There can be no danger that a man will devise his

estate with a view to litigation, which cannot take place till after his death. It is much more reasonable to suppose he would confess a judgment, and suffer the estate to be sold on execution for that purpose.

I think there is no error in the decision of the court, in the points excepted to by the defendants below; and that the judgment of the supreme court should be affirmed.

This being the *unanimous opinion* of the court, the judgment of the supreme court was thereupon affirmed with costs.