EDWARDS, *appellant, vs.* VARICK and others, *respondents.*

Where one who for many years had been in possession as mortgagee of a lot of land, devised it in fee to his son Joseph, with a provision that in case he died without issue it should go to his son Medcef, and made Joseph and Medcef his executors, and they as executors assigned the mortgage to J. W. by an instrument containing the following clause : "And we do hereby for ourselves and our heirs release and convey unto the said J. W., his heirs and assigns, all our right, title and interest in and to the said lot," &c.; *held* that the *mere naked possibility* which was devised over to Medcef was not affected, either in law or equity ; and that the *release and conveyance* were not an equitable contract on the part of Medcef to convey to J. W. the estate in the lot which he afterwards acquired by the death of Joseph without issue. BEARDSLEY, J. *dissenting.*

On appeal from chancery. The cause was commenced before the assistant vice chancellor of the 1st circuit, where a decree was made in favor of the complainant, which was affirmed by the chancellor on appeal. The facts of the case, with the opinion of the assistant vice chancellor, will be found in 1 *Hoffman's Ch. Rep.* 282, and the opinion of the chancellor in 11 *Paige*, 290. They also sufficiently appear in the opinion of Justice Beardsley. The cause was argued in this court by

*J. Van Buren*, (att'y gen'l,) & *S. A. Foot*, for appellants, and

*W. Hall* & *G. Wood*, for respondents.

Beardsley, J. In 1768, John Bridgewater and wife gave a mortgage on the lot of land in question in this case, to Sheffield Howard, to secure the payment of one hundred pounds at the end of one year from the date of said mortgage. In the spring of 1782, Bridgewater was indebted to Medcef Eden, senior, in the sum of one hundred and sixty-eight pounds, for which amount he then gave him his bond. In the course of that or the next year, Eden, upon some arrangement with Bridgewater, entered into possession of the lot so mortgaged to Howard, and in December, 1783, Howard sold and assigned the mortgage to Eden. About this time, Bridgewater and wife left the country, to which they never afterwards returned.

Eden remained in possession until 1798, when he made his will and died. By the terms of his will, he devised this lot, and other lands, to his son Joseph, his heirs and assigns forever; a like devise of other lands being also made to Medcef Eden, jun. his other son. A subsequent part of the will contained this clause: "It is my will, and I do order and appoint that if either of my said sons should depart this life without lawful issue, his share or part shall go to the survivor." Martha, the wife of the testator, and his sons, Joseph and Medcef, jun. were appointed executrix and executors of the will.

On the decease of Medcef Eden, senior, his son Joseph took possession of this lot of land, and remained in possession until

1804, when he and Medcef, jun. executed a deed, which will presently be particularly stated, and which purported to convey the lot in fee simple to Joseph Winter. Between the time of the death of their father, and that of the execution of this deed, Joseph and Medcef, jun. had both become insolvent, and in 1801 were discharged from their debts, under the insolvent law of 1788, having first made assignments of their property to John Wood, as required by the act. On the first of September, 1804, the deed of assignment and release of that date, to which I have referred, was executed by said Joseph and Medcef, jun. to Joseph Winter. It commences by a recital of the Bridgewater mortgage of 1768, and its transfer and assignment to Medcef Eden, sen. in 1783. It then states that said Medcef Eden, sen. by his last will and testament, devised said lot of ground to his son Joseph, and appointed his wife, Martha, and his two sons to execute said will, "as in and by the said last will and testament, reference being thereunto had, will appear." Then follows this clause: "Now know all men by these pres ents, that we, the said Martha Eden, Joseph Eden and Medcef Eden, for and in consideration of the sum of $500, to us in hand paid by Joseph Winter, of the city of New-York, the receipt whereof we do hereby acknowledge, have sold, assigned, transferred and set over, and by these premises do sell, assign, transfer and set over, unto the said Joseph Winter, his executors, administrators and assigns, the aforesaid indenture of mortgage, and the bond therein mentioned, and all moneys due and to grow due thereon. And we the said Martha Eden, Joseph Eden and Medcef Eden, do hereby for ourselves and our heirs, release and convey unto the said Joseph Winter, his heirs and assigns, all our right, title and interest, of, in and to the said lot of ground and premises before mentioned, and every part and parcel thereof." This deed was duly signed, sealed and executed by Joseph and Medcef, jun. but not by the widow, Martha Eden.

Winter went into possession of the lot, and held as owner, until May, 1805, when in consideration of two thousand six hundred and sixty dollars, he bargained, sold and conveyed the same to Samuel Boyd, in fee simple, with covenants of seisin,

Edwards *v.* Varick.

warranty of title, for quiet enjoyment and farther assurance. Boyd thereupon took possession and expended large sums of money in the reparation and improvement of said premises. In 1806, Boyd sold and conveyed said lot to Josepn Otis, in fee, with covenants of seisin, warranty and for quiet enjoyment; and in 1810, the same title, through sundry mesne conveyances, was transfered to Richard Varick, who thereupon took and held peaceable and undisturbed possession of the lot, until 1822, during which time, he expended several thousand dollars in making permanent improvements upon it.

Joseph Eden died in 1813, without issue. Medcef, jun. survived his brother several years, during which time he made claim to divers other parcels of land which had been devised by his father to Joseph, in the manner already stated; but it does not appear that Medcef, jun. at any time, after his brother's death, claimed or suggested that he had any right whatever to this lot. Medcef, jun. died in 1819, and Varick's improvements on the lot were made after the decease of Joseph, and during the life time of Medcef, jun.

By his will, made in 1819, Medcef, jun. devised his " whole real and personal estate to " his wife, Rachel, for life, with remainder to John Pelletreau, for life, but in trust for the benefit of the daughters of said Rachel, to wit, Sally Ann, Elizabeth and Rebecca, as well as of said Pelletreau, and with remainder over in fee, to said daughters. The will authorized Pelletreau " to sell and convey all or any part of " the real estate of the testator, after the death or marriage of his wife, provided Aaron Burr should " in writing, signed with his hand, approve and consent to such sale. But no sale should be valid without such approbation and consent."

In 1822, the widow of Medcef, jun. claiming title as his devisee, brought an action of ejectment against the tenant of Richard Varick, then in possession of this lot of land, and in 1827 judgment was rendered in favor of the plaintiff in said action by the supreme court, which was afterwards affirmed in this court, and she was thereupon put into possession. On the trial of that action, the deed from Joseph and Medcef, jun. to Win

ter, of 1st September, 1804, and which has already been men‑
tioned, was not proved to have been executed by Medcef Eden,
jun. its effect, as a conveyance of the lot by him, was not there‑
fore at all in question in that case, but the judgment of the
supreme court, as well as that of this court, was rendered ex‑
clusively on other grounds. (*Jackson* v. *Varick,* 7 *Cowen.* 238,
2 *Wend.* 166.)

Having thus recovered possession of the lot, the widow, Ra‑
chel Eden, sued Varick, who, as landlord, had defended the ac‑
tion of ejectment, and recovered against him several thousand
dollars for the mesne profits of the premises. Varick thereupon
brought suit against Boyd, on the covenants contained in the
deed of the latter to Otis, and recovered judgment against him
in consequence of the failure of the title which Boyd had so
warranted to be good. Boyd paid the amount thus recover‑
ed against him, being in the whole, about sixteen thousand
dollars.

It has already been stated that the deed of 1804, from Joseph
and Medcef, jun. was not, on the trial of the action of eject‑
ment against Varick, proved to have been executed by Medcef,
jun. With a view to determine the legal effect of that deed,
as a conveyance of the supposed right and title of Medcef, jun.
an action of ejectment was brought in 1828, by Varick, against
Rachel Eden, who was then in possession under the recovery
by her in 1827. This action was brought by Varick in the
superior court of the city of New-York, where judgment was
rendered in his favor; but, on a writ of error, that judgment
was reversed by the supreme court. It was held by the latter
court that by the will of Medcéf Eden, sen. his son Joseph took
a determinable, qualified or base fee, in all the land primarily
devised to him, which was certainly effective as an estate for
life, but that no present estate or interest therein, passed to
Medcef, jun. during the lifetime of Joseph. So long as Joseph
lived, Medcef, jun. had, what the law terms a mere possibility
of future interest, which being neither an estate, interest or
right, *in esse,* was incapable of being transferred by grant or
assignment at law. The only effect therefore, in a legal point

of view, of this deed of 1804, was to transfer to Winter the life estate of Joseph ; it did not transfer the fee simple, which under the will of his father, vested in Medcef, jun. on the death of Joseph without issue, in 1813. Consequently the legal estate, which Medcef jun. thus acquired, passed on his decease, in 1819, by his will to his widow for life, and constituted an insuperable obstacle to a recovery in the action brought by Varick. (*Pelletreau* v. *Jackson*, 11 *Wend.* 110.) This judgment of the supreme court was affirmed in the court of errors. (13 *id.* 178.)

Such, it will be observed, was held to be the effect of the deed of 1804, and the state of the title to this lot, *at law* :—the effect of the deed, and what rights were conferred by it, *in equity*, are different questions, which did not, and could not then arise, but which must be determined in the case now in judgment.

The judgment of this court in the action brought by Varick, to which I have adverted, was rendered in 1834. In the progress of that cause, and in 1830, the widow of Medcef, jun. died, when Pelletreau, as devisee in remainder for life, under the will of Medcef, jun. became entitled to the possession of this land. He thereupon took possession, and was made a party to the Varick suit, in lieu of the deceased widow, Rachel Eden. Pelletreau died in 1833, and about the same time, Elizabeth, one of the daughters of the deceased widow of Medcef, jun. also died. Elizabeth it will be observed, was one of the three devisees in fee of the estate of Medcef, jun. the other two being her sisters, Sally Ann and Rebecca. Sally Ann was then the wife of Benjamin Waldron, and Rebecca the wife of John L. Willson. They were all made parties to the Varick suit in the place of the deceased, Pelletreau ; but shortly thereafter, Willson and his wife released all their right to this lot to Waldron and wife, and were by arrangement, struck out of the record as parties to the suit, which thenceforth proceeded in the names of Waldron and wife alone as defendants.

This brings the history of the case down to the time when the appellant Edwards acquired whatever title he now has, or ever had to the land in controversy ; and which he sets up as

a bar to the relief sought by the bill filed in this case. He admits in his answer, that while the Varick cause was pending, he agreed with Waldron and wife, who were then in possession, to purchase the lot; and that afterwards, and before said cause was decided by this court, the lot was conveyed to him by them, by deed bearing date in October, 1834. He also admits that he then had full notice of the pendency of said suit, and of the claim of said Boyd to the premises in question.

Although Edwards appears to rely mainly on this purchase of the lot from Waldron and wife, and their conveyance to him, he attempts to fortify himself by the fact that he had previously made advances to Pelletreau, upon the strength of this lot as security for their repayment. After stating that Pelletreau, in January, 1833, applied, through Aaron Burr, for a loan of "four hundred and fifty dollars, by discounting the note of said Pelletreau for that sum at four months, the same to be secured by a conveyance of, or lien upon the said premises," the answer proceeds to set out the transactions which followed, very much at large. The substance of the whole matter, however, was, that Pelletreau executed an absolute conveyance of the lot to Edwards, reciting therein that Pelletreau was executor and devisee in trust, of all the real estate which was of Medcef Eden the younger, with power, by and with the consent of Aaron Burr, to sell the same, as would fully appear by the will which had been duly proved and recorded. To this conveyance was subjoined a declaration of the consent and approbation of Burr, duly executed by him. But Edwards at the same time executed a written defeasance, which stated that said conveyance had been given to secure him "for certain advances of money, to wit, the sum of four hundred and fifty dollars, on that day made to said Pelletreau," and also to secure such further advances as said Pelletreau might require, and said Edwards might be willing to make; and that upon the repayment thereof, with interest, Edwards was to reconvey the premises to Pelletreau, if in the city of New-York, otherwise to such person as said Burr should direct; but if default should be made in the repayment of the advances, the prem-

ses might be sold to repay them, with interest, the overplus to be paid to said Pelletreau or Burr. The answer further states that Pelletreau, shortly thereafter, went to the West Indies for the benefit of his health, having first given a power to Burr, "among other things, to sell, lease and convey, all the estate which the said Pelletreau held in his own right, or as executor and devisee in trust as aforesaid;" and that while he was absent, Edwards "had frequent money transactions" with Burr, under the power, the particulars of which are not specified; but it is said that the loans and liabilities of Edwards to Burr, under the power, amounted, in the month of November, 1833, to more than two thousand dollars, exclusive of the note for four hundred and fifty dollars, which had been paid by Burr. That Edwards expressed his apprehension that the aforesaid conveyance did not, under the circumstances, afford a sufficient security for the amount of his loans and liabilities to Burr; wherefore Pelletreau executed an agreement, reciting that Edwards "had assumed responsibilities amounting to two thousand and twenty-two dollars and fifty-four cents, *for the use and benefit of the said Aaron Burr and John Pelletreau, and on their account, and on account of the estate of Medcef Eden the younger;*" and engaging that the said lot, theretofore conveyed to said Edwards, as has already been stated, should remain liable and subject to the payment of the two thousand and twenty-two dollars and fifty-four cents. This is the substance of what is set up in the answer of Edwards, as the foundation of his alleged right to this lot, so far as the same grew out of his transactions with Pelletreau and Burr.

The answer admits that the only right which Pelletreau or Waldron and wife, had, or claimed to have to this lot, was founded on the will of Medcef, jun. and that they held as devisees under that will, and in no other character whatever.

Richard Varick, whose name has repeatedly been mentioned, died in 1831, having devised all his interest in and right to this lot, as well as other property, to Abraham Varick and John B. Varick. The bill, in this case, was filed in 1835, in the names of Samuel Boyd, Abraham Varick and John B. Varick.

They have all since died, but their rights and interests in the subject of this litigation, are now represented by the respondents to this appeal.

Although this case occupies a large space on paper, it does not embrace a very great number of points, and none which, in my judgment, are of very difficult solution.

The bill was filed to enforce the equitable rights of the complainants, founded, as well, on the deed to Winter, in 1804, as upon subsequent purchases of the lot by Boyd and Richard Varick, and the expenditures made by them upon it, while in possession thereof as owners. Winter paid, on the purchase made in 1804, as appears by the deed to him, the sum of five hundred dollars. The lot was sold to Boyd the next year for about two thousand six hundred dollars. It does not expressly appear what sum was paid by Varick in 1810, but large sums were expended by both Boyd and Varick in improvements on the lot, so that it had, unquestionably, cost the latter, when suit was brought against him in 1822, some ten or twelve thousand dollars, at the least. What the precise value of the lot was in 1804, does not appear, nor is it important that it should. Edwards has not, in his answer, set up that the sum paid by Winter was less than the value of the lot, so that the point, if material, is not made by him. But it is not material; for even if the consideration paid by Winter was greatly below the value of the lot, that would constitute no valid objection to granting relief in this case. This is not an ordinary bill for the specific performance of a contract, where chancery will refuse to decree such relief, if the consideration was grossly inadequate. But even upon such a bill it must be clearly shown that the amount paid was, comparatively trivial: it will not be intended that such was the fact, and if the defendant relies upon such ground he must show that the complainants were, in effect, but mere volunteers, and not purchasers for adequate value. Where the purchasers are but volunteers, a court of equity will not interfere to compel the specfic execution of the contract, but will leave the parties to their legal remedy for a recovery of damages upon it. Chancellor Kent

thus states the rule upon this subject: "It is a settled princi-ple, that a specific performance of a contract of sale is not a matter of course, but rests entirely in the discretion of the court, upon a view of all the circumstances. 'The jurisdic-tion,' as Lord Erskine observed, (12 *Ves.* 331,) 'is not compul-sory upon the court, but the subject of discretion ; the question is, not what the court must do, but what it may do under the circumstances.' A court of equity must be satisfied, that the claim for a deed is fair and just and reasonable, and the con-tract equal in all its parts, and founded on an adequate con-sideration, before it will interpose with this extraordinary assist ance. If there be any well founded objection on any of these grounds, the practice of the court is to leave the party to his remedy at law for a compensation in damages." (*Seymour* v. *Delancey*, 6 *John. Ch. R.* 224.)

The reason why a court of equity will not interfere in such cases is, that the party may have adequate relief at law, by a recovery of all the damages he is entitled to under the circum-stances. But that reason has no application to this case, for these complainants have no remedy whatever at law. At law the deed to Winter was invalid, as has been adjudged. No action at law will lie upon it, and, if the complainants have any redress whatever, it must be in a court of equity. It is, indeed, the very case in which that court should have jurisdic-tion, if a right is shown, for the law has not provided any remedy. Nor has a court of equity, in cases like this, a discre-tion to give or withhold its aid : if a right to redress is shown, it is the imperative duty of the court to grant it.

As no redress can be had at law in this case, it is by no means an ordinary application to compel the specific execution of a contract. There is a further ground too, why it is not such a case. If the complainants have established a right to relief, the appellant Edwards, who now has the legal title to this land, is virtually their trustee. The jurisdiction of the court of chancery is clear, on either ground ; and, as the bill was filed to enforce the equitable rights of the complainants, founded on the original deed to Winter, and subsequent pur-

chases of the lot by Boyd and Richard Varick, as well as upon large expenditures in improvements, the complainants must be regarded, in all respects, as bona fide purchasers for value.

The appellant Edwards is, in no sense, a bona fide purchaser for a valuable consideration. His contract for the purchase of the lot of Waldron and wife, was made while the action brought by Varick, for the recovery of the lot, was pending and undetermined in this court. This, the answer admits. It also admits that when the deed was given, Edwards was fully apprized " of the claim of the said Boyd to the said property." True, the answer also says that Edwards " was advised by counsel, and verily believed, that said claim on the part of said Boyd was unfounded, both in law and equity." But this is of no sort of consequence; the purchase was made with actual notice of the claim, and therefore could not, in the slightest degree, impair the validity of that claim. If an equitable right existed before the purchase by Edwards, it remained in full force against him. In equity no one was ever allowed to gain an advantage, by the purchase of property in controversy, or in regard to which an equitable claim existed, the purchaser being apprized when he made the purchase of such controversy or claim. The principle is one of obvious equity and of universal application, and is too plain to require or admit of discussion. Nor did Edwards gain any thing by his pretended purchase of Pelletreau. It was not, in truth, a purchase, for the transaction, at the utmost, amounted only to a mortgage to secure advances made by Edwards to Pelletreau alone, or to him and Aaron Burr. Taking the statement made in the answer to be true, the transaction looks more like an effort to secure moneys loaned by Edwards to Burr, than loans actually made to Pelletreau. But this is of no importance in any point of view, for there was no power to secure loans made to Pelletreau himself, on this land. He had a life estate only in the land, under the will of Medcef Eden, jun. although he was authorized to *sell*, not to *mortgage*, the land devised by that will. Such sales were to be made with the consent and approbation of Aaron Burr, to be expressed in writing, and no sale

without such consent, was to be valid. The moneys arising from such sales were also to be vested and secured for the purposes of the will. As the business was in fact transacted between Pelletreau and Edwards, the former made a conveyance in fee of the lot to the latter, to secure the sum of four hundred and fifty dollars advanced to Pelletreau as a loan on his note. Subsequently more than two thousand dollars were advanced by Edwards to Burr, in the course of "money transactions" between them, under a power of attorney from Pelletreau to Burr. This power authorized the latter to sell, lease and convey all the estate which Pelletreau held in his own right, or as executor and devisee as aforesaid. No particular statement of these advances is given in the answer, or otherwise, and there is no ground for saying that they were really loans to Pelletreau alone. If they, however, had been, that would have amounted to nothing. He had power to *sell,* but not to *mortgage;* clearly not to mortgage to secure loans to himself, and if that be possible, still less to secure loans made to Burr under such a power. The attempt to charge this lot with the large sum advanced to Burr, was wholly unauthorized by any thing contained in the will of Medcef Eden, jun. and, as to these complainants, an absolute nullity.

There is no aspect then, in which Edwards can justly set up the rights of a bona fide purchaser. It is wholly immaterial whether he advanced or paid the full value of the lot or not. If he did so, he did it upon an arrangement with Pelletreau and Burr, for which there was no authority in the will of Medcef Eden, jun. or it was done with full notice of the claim of Boyd. By the purchase, Edwards therefore gained no advantage, but was merely substituted in right for Waldron and wife: their right and title became his. We have seen that the only right of Waldron and wife was founded on the will of Medcef Eden, jun. for it is not pretended they were, in any sense, bona fide purchasers for value. In the end therefore it comes to this; that Edwards stands precisely in the place of Medcef Eden, jun. and if the complainants would have had good right against him if he had been living and a party defendant, they have

the same right against Edwards, as he purchased with notice of the equity, whatever it may be.

Much discussion was had on the question whether the Bridgewater mortgage, assigned to Medcef Eden, senior, in his lifetime, had been paid off, or was to be deemed unsatisfied and still in force as an incumbrance. I see no consequence in the fact, be it one way or the other ; nor in the view I take of the case, is it material to inquire whether Medcef Eden, senior, possessed the lot as owner in fee, or in subordination to Bridgewater, although there is very little to justify the latter conclusion. One thing is certain—that is, Medcef Eden, senior, assumed to devise this lot in fee simple to his sons, Joseph and Medcef, jun. All parties to this suit claim that such an estate passed by that devise, the dispute being, who amongst themselves, is now entitled to that estate. The appellant, Edwards, claims that he has the better title, through the devisees of Medcef Eden, jun. while the respondents insist that in equity and justice, their right, founded originally on the deed of 1804, is paramount to that of the appellant, as he bought with notice and therefore in bad faith. They all agree that one party or the other to the litigation is entitled to the lot: how then, as between these litigants, can it be necessary to inquire in what character Medcef Eden, senior, held possession, or whether his estate in this lot was or was not an indefeasible fee ?

And for like reasons, and on similar grounds, it seems to me superfluous to inquire whether the title to this lot, which vested in Joseph and Medcef, jun. under their father's will, passed to John Wood by their assignments under the insolvent law, in 1801. Neither of the parties to this suit is in a position to raise that question, and so far as respects them, it is immaterial whether such assignments were or were not made ; and if they were, whether they passed title to this lot to Wood or not. In 1804, three years after these alleged assignments had been executed, Joseph and Medcef, jun. assumed to convey the lot in fee simple to Winter. It is not alleged that he had notice of the previous assignments, if that could have varied the case. The complainants, who are now represented by the respon-

dents, rest their claim on that conveyance. The appellant, Edwards, makes no title under Wood, but asserts the invalidity of the deed of 1804 to Winter : at least its absolute invalidity so far as respects Medcef Eden, junior. That consequently, when Joseph died, in 1813, Medcef, jun. became seised in fee, under the will of his father, and that on the decease of Medcef, jun. in 1819, the estate in this lot passed by his will to his devisees, under whom, and under whom alone, Edwards asserts that he now has the better title. The asserted rights of all parties to this litigation, it will therefore be seen, have their rise in Medcef Eden, jun. and years after the assignments made to Wood. Neither party claims under Wood, but both of them in hostility to him. How then can the assignments to Wood come in question between these parties? Their rights, as between themselves, are here to be passed upon. None of these rights were derived from Wood, and his title, whatever it may be, cannot be affected by any decree to be made in this case. If Wood has title, he can enforce it against the prevailing party : but as both parties to this litigation are strangers to that right, they cannot draw it in question in a litigation between themselves. The principle, in this respect, is the same that it would be in an action of ejectment, between parties similarly situated. Let us suppose that Joseph Eden, after the execution of the deed to Winter, in 1804, had refused to surrender possession, and Winter had brought an action of ejectment against him. It is plain that Joseph could not have set up as a defence to the action, his assignment to Wood in 1801. The answer to such an offer on his part, would have been, that having assumed to convey as owner in 1804, he must give effect to his own act by surrendering possession : that, as between Winter and himself, it was immaterial whether he had good title or not, when he gave the deed in 1804. If he had not, the law would not allow him to make the objection to defeat his own deed. He must give up possession to his grantee, and leave Wood and all others who might have a paramount title, to adopt such course as they might think proper to enforce their own rights. So, admitting the deed to Winter to

have been effective *at law*, against Medcef, jun. if an action of ejectment, founded on that deed, had been brought against Edwards, instead of filing this bill in chancery for equitable relief, it is equally plain that Edwards could not have set up the assignments to Wood in 1801, to defeat such an action. If Edwards held under Wood, then no doubt, the title of the latter might be set up and relied upon ; as it also might be if Edwards was not shown to hold under Medcef Eden, jun. The case last supposed would be like that of *Jackson* v. *Harrington,* (9 *Cowen,* 86,) referred to on the part of the appellant. But claiming solely under a devise from Medcef, jun. Edwards would not be al- lowed, as against the grantee of Medcef, jun. to set up that he had previously conveyed to Wood. This would be the rule in an action of ejectment between these parties, if the deed of 1804 had been available *at law*. But it was invalid at law, and only to be enforced in equity. It is perfectly clear, there- fore, as it seems to me, that Edwards cannot set up the assign- ments to Wood, whatever may have been their effect, as between the parties thereto. Edwards does not represent Wood, and is a stranger to his rights : he therefore cannot draw them in question here. The complainants cannot be compelled to litigate any such question in this case, for whatever decree might be made, would be of no avail in a suit between Wood and themselves. Wood certainly would not be bound by it, as he is not a party, nor does any one here hold in privity to him. On no principle, as it seems to me, can the assignments to Wood, or their effect and operation, be drawn in question in this case.

I have adverted to the deed of 1804, without stopping to in- quire whether its execution was established by proper proof. But the point has not been overlooked : in my view of the evi- dence it shows, very satisfactorily, that the deed was duly exe- cuted by Medcef, jun. as well as by Joseph. If it had not been it is, at the least, highly improbable Medcef, jun. would not have interposed a claim to the lot, from the time of Joseph's death in 1813, until his own in 1819.

It was urged, on the argument, that the judgment rendered

in the action brought by Varick against Rachel Eden was a fatal obstacle to any relief in equity. This objection cannot, as I think, be sustained : nor can the grounds, or principles, on which that judgment was rendered, have any such effect. That judgment was rendered by a court of law, upon a question of strict legal right; the only inquiry being where was the legal title. That was held to be in the devisees of Medcef Eden, jun. and not in Varick, and this decided the case at law. Here, the question is as to the *equitable right,* and not the legal title. The bill virtually concedes that the deed of 1804 was inoperative at law, and that notwithstanding such deed, the legal title was in Medcef, jun. at his decease, and passed by his will to his devisees. The bill, however, insists that an equitable right passed by the deed to Winter, and from him to Boyd, and that this was available against Medcef, jun. in his life, and consequently against his devisees, and those claiming under them with notice, after his decease. It was to enforce this equity, against Edwards, who is assumed to have the legal title, that the bill was filed. If the complainants were entitled to any redress, it could only be had in a court of equity : there was none at law, as had already been decided. But the judgment at law concluded nothing as to the present question. I know of no principle on which it can be maintained that a judgment at law, upon a matter of legal right, will in any case constitute an objection to granting relief upon grounds cognizable in equity alone, if any such exist in regard to the same matter; and I agree with the chancellor, that the decision of this court in the action of ejectment " is only *res judicata* and conclusive as to the legal title to the premises, and does not in any way affect the equitable rights of the complainants, except so far as it settles the question that their remedy, if any, is in" a court of chancery, and not in a court of law.

That the parties to the deed of 1804 intended every part of it should have some meaning and effect, cannot well be doubted ; and it is the duty of the court, if the words used will admit of it, so to construe the instrument that every clause and word shall be sensible and effective. In the first place the deed was

designed to be, and was, a transfer and assignment to Winter, of the Bridgewater mortgage; so far, there is no room to mistake what was intended by the parties. The mortgage had been assigned to Medcef Eden, senior, who held it at his decease; and this transfer was, necessarily, to be made by some, or all, of his personal representatives. As to the assignment of this mortgage, the deed was the act of Joseph and Medcef, jun. in their representative character and capacity, as executors of their father's will, and not their personal and individual act. But this was not the only object of the deed, for the clause which follows the assignment of the mortgage had reference to the individual rights and interests of Joseph and Medcef, jun. and was in no sense connected with their representative character or duty. The land mortgaged had been devised to Joseph, in such form and manner that he certainly took an estate for life, and might thereafter take an absolute fee. By the devise, if Medcef, jun. should die before Joseph, the estate of the latter, in this lot, would at once be changed to a pure fee; and on the other hand, if Joseph should die first, and without issue, Medcef, jun. would himself become seised in fee. Thus, when this deed was executed, although Joseph had a life estate certain in the lot, the fee was in contingency. One of the two brothers was, however, certain to take it under their father's will, but which of them was then altogether uncertain. In this state of the title the deed was executed. The clause which follows the transfer of the mortgage, declares that the grantors did thereby, for themselves and their heirs, *release and convey* unto the said Joseph Winter, his heirs and assigns, all their right, title and interest, of, in and to the said lot of ground and premises, and every part and parcel thereof. The deed is more than a mere *release*, for it assumes to *convey*, as well as release, and is therefore equivalent to both a release and an assignment.

This deed, it may be observed, was drawn with cautious regard to the rights of the parties, representative and personal, as well as to the objects in view. The mortgage, being but a security for a debt, was assigned and transferred to Winter, *his executors and administrators*, but the land being real estate,

together with all right, title and interest, of, in and to, the same, was released and conveyed, in terms, to him and *his heirs.* The mortgage was assigned by Joseph and Medcef, jun. *as executors* of their father's will ; but the conveyance of the land, and all right thereto, was by them, personally, for themselves and *their heirs.* It is thus clear that the distinction between conveyances of personal and real estate was in view, appropriate terms for each being used in this deed. It is then quite manifest, upon the words used, that the deed was not only intended to transfer the mortgage to Winter, but also to convey to him a freehold estate in the land mortgaged. Joseph had, under his father's will, a life estate certain, and, as we have seen, he might acquire the fee. All this he certainly meant to convey to Winter, and so far as respects the life estate, the deed was, unquestionably, operative at law. But Medcef, jun. might also take the fee under his father's will. This appears on the face of the will, which being referred to in the deed, was thereby made a part of that instrument. If the clause of the deed now under consideration, was not intended to transfer this contingent right or possibility of Medcef, jun. to the grantee, it had, as to Medcef, jun. no object whatever, and, so far, was senseless as well as nugatory. But where a sensible and pertinent meaning can be given to words, courts are not at liberty to regard them as merely formal and idle. I cannot therefore doubt, upon the words here used, that the deed was designed and intended to transfer to Winter as full an estate in the lot, as Medcef Eden, sen. himself had at his decease, and as the grantors, Joseph and Medcef, jun. expected, in any event, to acquire under the will. This estate, they supposed, was, or would be, an absolute fee simple. But, as such was then the state of the title, under the will, that it was impossible to transfer a *legal* right to Winter, the deed should, if practicable, be so construed as to vest an *equitable* interest in the grantee and those holding under him.

This deed has repeatedly been before the courts, but, as far as I know, it has never been held or supposed, that it was a mere assignment of the Bridgewater mortgage, or that the terms

used to describe what was intended to be conveyed, did not embrace the then contingent interest or possibility of Medcef Eden, jun.   The reverse may, indeed, be said to be the truth ; for the successive judgments in the action of ejectment brought by Varick against Rachel Eden, all proceeded on the assumption that, in this respect, the deed was fully sufficient.   The question was first made in the superior court of the city of New-York, where, as I understand, it was held, not only that the deed embraced the contingent right of Medcef Eden, jun. but also that said right was thereby tranferred *at law* to Winter, the grantee in said deed.   This judgment was reversed in the supreme court, on the single ground that a mere possibility could not be conveyed at law, and of the same opinion was this court.   Neither the supreme court, nor this court, proceeded at all on the ground that the deed was not broad enough to reach the interest of Medcef Eden, jun.—but on the principle that the interest he then had in the lot was such that it was incapable of being transferred at law.   On this precise point, the supreme court and this court differed with the superior court, although they all seem to have held, without hesitation or doubt, that the deed was sufficiently broad to transfer the right, if, in its nature, it was capable of transmission in that way.

In form this deed purports to release and convey all the right, title and interest of the grantors, and is not an express agreement to convey in future ; but, in legal effect, it was equivalent to the latter.   For where a party, having but a bare possibility of a future fee in land, executes a conveyance thereof, founded on a valuable consideration, and with intent to transfer his contingent interest, such conveyance will, in equity, be deemed an agreement to convey, whenever the fee shall vest in possession, and will be enforced accordingly.   The person so conveying is not only bound by his deed, as an agreement to convey, but as soon as title vests in him, he will be deemed to hold the land in trust for his grantee, who, in equity, is regarded as the real owner.   This is the principle.   In *Wright* v. *Wright*, (1 *Ves. sen.* 409,) a party, having a possibility of future interest in land made a conveyance thereof.   It was admitted the right

could not be transferred at law, and the question was as to the effect of this conveyance in equity. Lord Chancellor Hardwicke, having adverted to a case in which there was an express agreement to convey in future, said—" There was an agreement on marriage to settle all such lands as came by descent or otherwise from his father : which this court carried into execution, notwithstanding an expectancy of an heir at law in life of his ancestor, is less than a possibility. It is such as he may bind himself : in law the heir may levy a fine of lands in the life of his ancestor, which will bind by *estoppel* after descent to him. So there is a method of conveying, that is, preventing a claim against it ; and so here he may release. In that case it was made good by way of agreement for valuable consideration ; then how does an assignment differ from it ? *An assignment always operates by way of agreement or contract : amounting in the consideration of this court to this, that one agrees with another to transfer, and make good that right or interest, which is made good by way of agreement.*" The case was disposed of on the principle that the conveyance executed, was in equity equivalent to an express agreement, and the point is fully sustained by other authorities. (*The Duke of Chandos* v. *Talbot*, 2 *P. Wms.* 608 ; *Whitford* v. *Faussett*, 1 *Ves. sen.* 390 ; *Wils. on Springing Uses,* 159; *Cornish on Rem.* 222.)

I think the deed executed to Winter should have the same effect. The will of Medcef Eden, senior, showing what were the rights of Joseph and Medcef, jun. was by reference made a part of the deed, and the grantors, as I think, intended to transfer every thing which by the will was devised to both Joseph and Medcef, jun. The words used must receive this interpretation, or as to Medcef, jun. they have no sensible meaning whatever. Even at law, where a deed cannot operate in the particular manner intended by the parties, it will be construed so as to be effectual in some other way. A deed intended to operate as a lease and release, or bargain and sale, but which cannot have effect as such, may be made effectual as a covenant to stand seised. A conveyance by lease and re-

lease, void as such, may still be construed to operate as a grant and assignment : and a deed of release, which as such, can have no effect, may, notwithstanding, be made effectual as a grant, (*Cruise's Dig. tit. Deed, ch.* 19 ; *Jackson* v. *Blodgett,* 16 *John.* 172.) These all rest on the principle that effect, if possible, shall be given to what the parties intended to accomplish, and if this cannot be done in the particular mode intended by them, it shall be in any other mode consistent with the rules of law. (*Hathaway* v. *Power,* 6 *Hill,* 453.)

When the deed of 1804 was executed, Medcef, jun. had no present estate in the lot, but he had under his father's will, a possibility of a future estate in fee. In its nature this possibility was incapable of being transferred at law. Hence, when Joseph died in 1813, the fee vested in Medcef, jun. and on his decease passed to the devisees in his will. As the deed of 1804, so far as respects the fee which Medcef, jun. acquired in 1813, was inoperative *at law,* it was held that Varick could not recover in the action of ejectment brought by him ; and the question now arises, was that deed operative *in equity,* so that when Medcef, jun. acquired a title, capable of being transferred, he was bound in good conscience to convey it. I think I have shown that the deed to Winter was equivalent to an express agreement to convey, and being founded on a valuable consideration, if the right could be conveyed or bound, by any form of deed or agreement, this was effective for the purpose. Nothing has since occurred to bar, or impair, the right originally conferred by that deed. The judgment in the action at law is no obstacle ; and the right to redress is not barred by lapse of time. The appellant, Edwards, gained no new right by his purchase, for he bought with notice and therefore in bad faith. He stands here with the rights of Medcef Eden, jun. and his alone : if this deed would, therefore, have been available against him, it is equally so against Edwards.

The contingent right to this lot, which Medcef Eden, jun had in 1804, has been termed a bare possibility ; but it is desirable to obtain a more precise idea of the nature of the right than these words import. " Possibilities," says Mr. Coventry in

a note to Powell on Mortgages, (*p.* 17, *b.*) " are generally arranged into two classes: the one, consisting of possibilities, which are coupled with an interest, such as contingent remainders, executory devises, springing or shifting uses : the other of bare or naked possibilities, such as the hope of inheritance, entertained by the heir on the courtesy of his ancestor, or the chance of succession of an individual where the gift is to several, with remainder to the survivor.    The former class," he adds, " may, perhaps, with more propriety be denominated contingent interests, and the latter mere expectancies; for a possibility coupled with an interest, is more than a possibility, it is a present interest and may be devised.    (*Perry* v. *Phillips*, (17 *Ves.* 173, 182.)    On the other hand, the expectancy of an heir apparent, during the lifetime of his ancestor, is less than a possibility, being but a mere hope or anticipation."

One class of possibilities is, therefore, such as are coupled with an interest : that is an interest which is descendible or devisable.    But the possibility in this case, was not of that description, for Medcef, jun. had, in 1804, no right to this lot, vhich had he then died, could have passed to his heirs or devirees.    Had he then died, the absolute fee would have vested in Joseph, so that it was impossible that any thing, in that event, could have passed to the representatives of Medcef, jun.

Nor was the right of Medcef, jun. in 1804 precisely the expectancy of an heir, during the lifetime of his ancestor.    I know that such an expectancy is sometimes called a possibility.    (*Jones* v. *Roe*, 3 *D. & E.* 88 ; *Atherly on Mar. Settlements*, 51, 55.)    And again it is said to be less than a possibility.    (2 *Fearne by Smith*, 23 ; 1 *id.* 551.)    " The heir," said Mr. Justice Story, in 1 *Pet.* 220, (*Comegys* v. *Vasse*,) " during the lifetime of his ancestor, has no right, claim, title or interest in the ancestral estate.    It is a mere naked expectation, liable to be defeated at the will of the ancestor at all times, and in no just sense, a possibility of interest, a right in the thing itself."

Medcef Eden, jun. under the will of his father, had much more than the mere expectancy of an heir, for that may be

defeated at the will or caprice of the ancestor. But this right of Medcef, jun. was not dependent upon any such contingency. His ancestor was dead, and by the limitation in the will it was certain that if Joseph died, without issue, in the lifetime of Medcef, jun. the fee simple would vest absolutely in the latter In these respects the right was contingent, but in all others it was certain. It was not a possibility coupled with a descendible or devisable interest; nor was it the mere expectancy of an heir. That possibilities, coupled with an interest, may be transferred and bound, in equity, is not denied or questioned, as far as I know, by any one; and the doctrine is equally well settled, as I think, that the expectancy of an heir, though less than a possibility, and a naked possibility, uncoupled with any devisable or descendible interest, may be transferred by deed or bound by contract, so that a court of equity will give full force and effect to the same. This I will proceed to show.

The case of *Hobson* v. *Trevor*, (2 *P. W.* 191,) was decided by Lord Chancellor Macclesfield, and is directly in point as to the expectancy of an heir. In that case the complainant being about to marry the defendant's daughter, the latter gave him a bond, reciting the intended marriage, and in consideration thereof bound himself to settle on the complainant, " one-third part of all such real estate, as should descend or come to " the defendant upon the decease of his father. The marriage was had, and shortly after the defendant's father died, " whereby a great real estate came to the defendant as eldest son and heir of his father." A bill was then filed for a specific performance of the agreement to convey to the complainant one third of said real estate. It was objected that it would be " a dangerous precedent to suffer an heir apparent to dispose of his father's estate before he has it." But the Lord Chancellor said, " this is an agreement made upon a valuable consideration, that of the marriage of a child, and therefore fit to be executed in equity." Execution of the agreement was accordingly decreed.

A like decree, in principle, was made in the case of *Beckly* v. *Newland*, (*id.* 182,) upon an agreement between the com-

plainant and defendant to share, equally, what either of them might receive by devise from a third person. And in the late case of *Wetherel* v. *Wetherel*, (2 *Sim. R.* 183,) an agreement between two sons to divide equally whatever property they might receive from their father, in his lifetime, or which they might become entitled to under his will, or by descent or otherwise, from him, was held not to be contrary to public policy, and performance if it was decreed in equity. The case of *Wiseman* v. *Roper*, (1 *Rep. in Ch.* 158,) was decided on the same principle. (*See also* 1 *Fearne by Smith*, 550, 551 ; 2 *id.* 436; *and* 1 *Fonb. Eq.* 214, 215.)

But the authorities are equally direct to show that such a possibility as that of Medcef, jun. during the lifetime of Joseph, although unaccompanied by a descendible or devisable interest, might be bound in equity. " In equity," says Mr. Coventry in the note already referred to, " every species of contingency may be bound by contract for valuable consideration." The same principle is stated in 1 *Prest. on Estates*, 76, *Jinck. Anal.* 274 ; *Wils. on Springing Uses*, 159 ; *Corn. on Rem.* 232 ; *Watk. on Convey.* 130. And it is sustained by adjudged cases. The first case I shall refer to is *Whitfield* v. *Fausset*, (1 *Ves. sen.* 387.) As far as is material to the present question, that case was as follows : By a marriage settlement land was conveyed to the intended husband " and his assigns, during his life, without impeachment of waste ; and from and immediately after his decease if his intended wife should survive and have issue of her body then living, that she should receive, take and enjoy for her jointure, and in lieu of dower, a rent charge of £20 per annum, payable quarterly ; and from and immediately after the decease of them both, and of the longer liver, the heirs of the body of them and their heirs, should take one annuity of £20 per annum." The husband and wife had two sons, who, during the life of their parents, for a valuable consideration, executed a conveyance to the complainant, of all their interest in the said annuity which might thereafter arise in their favor. After the death of the father and mother a bill was filed to enforce payment of this annual rent, the complain-

ant "insisting that though the sons had nothing in them which they could convey in point of law, as an heir apparent cannot in the life of his father, yet a court of equity will support such a conveyance by way of assignment or agreement." Upon this point the lord chancellor expressed himself as follows: "The plaintiff claims as a purchaser for valuable consideration: and it is an odd purchase, and not to be encouraged: because it being in their mother's life, the vendors were not her heirs, not having it in actual possibility: an odd and unusual expression of Lord *Hobart*, page 45. But he meant that it was a kind of double possibility; the rent charge might never arise at all, or if it did, the two sons at the death of the mother might not be heirs of the body to take it. If they had died in the life of the mother without issue, the rent had been gone: if they had left issue other persons would be entitled to take it by purchase. Nothing passed therefore by that conveyance in point of law, it being by deed and no fine, which if it had been levied of this rent, and they had survived their mother as against them it would have operated by estoppel, binding them and their issue. It is true, in a court of equity a *chose in action* may be assigned, and a possibility which has been for a valuable consideration: and many transactions have been established in equity, which could not at law, and decrees obtained." It was therefore held that the sons were bound by their agreement, upon which the plaintiff had an equitable right to the rent, and as against the sons it was decreed accordingly.

The case of *Higden* v. *Williamson*, (3 *P. Wms.* 132,) was this. A father devised land to his daughter for her life, and then to trustees to be sold by them, the money arising therefrom to be divided amongst such of the daughter's children as should be living at the time of her decease. The daughter had issue, one of whom, a son, became a bankrupt, and his estate was assigned under the bankrupt act, which authorized an assignment of "all that the bankrupt might depart withall." This assignment was made during his mother's life. After her decease, the assignees in bankruptcy claimed the share of

Edwards v. Varick.

the bankrupt son, in the money arising from the sale of this land. It was objected that when the assignment was made, no manner of right to this money was vested in the son, as it was to be paid to such of the children of the mother, *as might be living at her death;* and she was at that time alive: that the son had but a possibility, and so nothing which could be assigned. But it was held that the bankrupt might have transferred this interest, and therefore the assignees were entitled to it under the assignment.

These authorities show, that a right, resting in mere possibility, which is not coupled with a descendible or devisable interest, may for a valuable consideration, be transferred and bound in equity, and such is the case now to be determined. And why may not one having such a right, bind himself to transfer it to a purchaser for a valuable consideration? In point of policy or justice, what objection was there, to its being done in this instance by Medcef Eden, junior? I confess I see none. We have seen that an heir, whose right is less than a possibility, may do it; and as such transfers are upheld in a court of equity, it would seem to follow that this certainly should be.

I think that the complainants were entitled to relief in this case. Their claim was founded on strong grounds of equity, for large sums had been paid for the lot and expended in its improvement. There is nothing in the case to call in question the good faith of these successive purchases, or of the expenditures made to improve the lot. The appellant, Edwards, on the other hand, bought with notice of the equitable claim of Boyd, and therefore in bad faith towards that claim. Such being the only ground on which his alleged right rests, he is precisely in the place of Medcef Eden, jun. The equity of the case, as between the complainants and Medcef, jun. would hardly admit of a doubt; and as that is substantially the question to be decided between the parties to this appeal, my opinion is, that the decree of the chancellor should be affirmed.

PORTER, Senator.   In approaching the discussion of this case, it is important to understand the decisions that have been made, and the principles that have been settled, in the controversies that have grown out of the wills of Medcef Eden the elder and younger.   In the earliest case of *Anderson* v. *Jackson*, (16 *John.* 382,) it was decided in this court, that the clause in the will of Medcef Eden, senior, directing that if either of his sons should die without lawful issue, his share under the will should go to the survivor, created a good limitation over in fee, by way of executory devise, to the survivor, on failure of *issue living at the death of either of the sons.*   Joseph Eden having died in August, 1813, without lawful issue, leaving Medcef, jun. surviving him, it followed that the real estate given by the will of their father to Joseph, vested in Medcef, jun. at the death of Joseph.   The premises in question is a portion of that estate devised to Joseph.   The devisee of Medcef Eden, jun. took possession of the premises under the title which had been declared valid in the case of *Anderson* v. *Jackson ;* and subsequently Varick, claiming title through a conveyance from Joseph, and also under an assignment of a mortgage, which I will hereafter notice more particularly, brought a suit against the devisee of Medcef, jun. to recover these same premises.   On the trial the plaintiff proved a mortgage upon the premises from Bridgwater and wife, to Howard, dated 15th August, 1768, to secure the payment of £100, one year after date ; an assignment of that mortgage from Howard to Eden, senior, dated December 25th, 1783, by which Howard bargained, sold, released, assigned, transferred and set over unto Eden, all his right title and interest, of, in and to, the said premises, together with the said mortgage ; the will of Eden ; and an assignment of the Bridgewater mortgage to Joseph Winter, dated September 1st, 1804, drawn to be executed by Martha, widow and executrix, and Joseph and Medcef, executors of the will of Medcef Eden, deceased, but in fact only executed by the executors.   This assignment is in the usual form of assignments of mortgages, except that it contained this clause : "And we the said Martha Eden, Joseph Eden, and

Medcef Eden, do hereby, for ourselves and our heirs, *release and convey* unto the said Joseph Winter, his heirs and assigns, *all our right, title and interest,* of, in and to the said lot of ground and premises before mentioned, and every part and parcel thereof." He traced title under that mortgage, it having been foreclosed to himself. When the case came before the supreme court, that court decided that the Bridgewater mortgage was not at the time of the assignment to Winter, a *valid and subsisting incumbrance ;* that Medcef, jun. at the time of the assignment, had no right in esse in the premises, but a *mere naked possibility of interest;* that such possibility was not the subject of release ; and that the release being without warranty, those claiming under Medcef, jun. were not estopped from setting up his after acquired title. When the cause came here, this court held, (*Jackson* v. *Waldron,* 13 *Wend.* 178,) that the right of Medcef, in the share devised to Joseph, during the lifetime of Joseph, was a mere naked possibility, and that it was not assignable or releasable during that time; and that the mortgage, at the time of the assignment, was not a valid lien, but was merged and extinguished in the fee. These are some of the principal questions that must now be deemed definitively and unalterably settled in all suits, at law or in equity, connected with or growing out of the titles created or granted by these wills.

The assistant vice chancellor goes into an argument to prove that the elder Eden, at the time of his death in 1798, was a mortgagor in possession of these premises, and nothing more ; and that that was the only interest that passed or could be affected by his will. But he admits that this court has decided that the Edens had a right other than that which grew out of the mortgage ; that the fee simple title existed in Joseph at the time of the assignment, subject to the contingency mentioned in the will. That being so, I am unable to see what bearing any question connected with that mortgage can have upon this case. If the twenty years' possession under the mortgage had matured the title in the Edens, then the mortgage had become merged and extinguished in the higher title ; and no right based upon that

instrument as a mortgage could be saved or gained to any one. The right which Joseph Winter acquired under the assignment, as the deed of Joseph and Medcef Eden, is a distinct question. But the mortgage itself was as completely annihilated, as an existing incumbrance upon the premises, as though it had been paid, and in form cancelled of record. Such has been the decision of this court.

But in order to ascertain what further has been decided in these controversies, and what there is still left for this court to pass upon, I will refer to the opinion of the court below in this case, and to the decision of this court in a former case. The assistant vice chancellor, in his opinion, which opinion was adopted by the chancellor, when speaking of the decision of this court in *Jackson* v. *Waldron,* says, " that the decision is, that Medcef's interest in the title could not be transferred by assignment, so as to vest the title subsequently acquired by him as a legal title, and to bar his recovery at law :" " that he could not transfer a title available in a court of law to the estate in fee, which, upon the expressed contingencies happening, would vest in him :" " that Medcef's interest was a naked possibility without an interest, and could not be subject to a valid transfer at law." In this exposè of the decision of this court referred to I must think that the vice chancellor has erred. Mr. Senator Tracy gave the opinion, in which a majority of the court concurred ; and after a very able and discriminating review of the cases, and reference to numerous authorities, upon the right which Medcef took under his father's will during Joseph's lifetime, he concludes thus : " Being thus compelled, I may say, by the whole current of authorities, to conclude that a right, such as Medcef Eden the younger had in the premises during his brother's life, was only a mere naked possibility, inasmuch as the devise to him was wholly dependent for direction on survivorship—the remaining inquiry is whether such a possibility was in any form transmissible. This inquiry is already pretty fully answered by the authorities which have been cited. It would seem a necessary consequence that if Medcef Eden had no interest in the estate, and a mere naked possibility is in law no

interest, then there was nothing which could pass by his release; *ex nihilo nil fit.*" "The rule seems to be now admitted that every interest or estate in lands may be released to the terre-tenant, though it might not be grantable to a stranger." And after quoting and considering some cases, he continues, " they do not trench at all upon the old doctrine in Lampett's case, that a contingent interest is not assignable. Much less do they impeach, but by implication strongly affirm the principle, that a mere naked possibility is neither descendible, devisable, assignable, nor releasable. And that a mere possibility is not a right in being, but an abstraction too remote and uncertain for any form of conveyance to reach." Such is the view taken by this court of the right or interest of Medcef Eden in the premises during the life of Joseph. It is, I think, going further than merely deciding that " Medcef's interest in the property could not be transferred by assignment, so as to vest the title subsequently acquired by him," or that his " interest was a naked possibility without an interest, and could not be subject to a valid transfer at law."

It must be remembered that I am now speaking of some right or interest in the premises existing at the time of the assignment; and not of the power of Medcef to make a contract in respect to any future interest, which a court of equity would enforce. I consider it, therefore, the settled law of this court, that Medcef Eden had no interest in the premises during Joseph's life; and consequently that he could release none; that all his right under his father's will, in respect to these premises, consisted of a mere possibility, which could not be the subject of any form of conveyance.

But the point taken, and principally relied upon by the respondents, to sustain the decree made in this cause by the court of chancery, is this: that by the assignment, all the future contingent interest of Medcef Eden in the premises in question, under the will of his father, though a mere possibility, and as such inalienable and not releasable at law, passed in equity to the assignee. And since it has been adjudged that the conveyance executed by him, was inoperative to transfer that

future contingent interest, which has since become a vested estate ; it is claimed that a court of equity will interfere and grant the proper relief, by compelling the appellants, who claim under the will of Medcef Eden, jun. to execute the requisite conveyance to transfer to the respondents the title which vested in Medcef Eden, jun. on the death of Joseph. And this claim is attempted to be sustained on the ground that a court of equity imposes upon the conscience of the assignor, the duty of performing and executing all the acts and deeds that are necessary to enforce at law the rights of the assignee, under an arrangement which has been defectively executed. The principle embraced in this proposition, as applied to some cases that have arisen, is supported by high authority.

If a person has agreed with another on good consideration, to convey to him a specified right or title to premises, and has failed to do so, either from some defect in the instrument he has executed, or because the right or title had not at that time become vested in him, but is subsequently acquired; we can readily understand why the extraordinary power of the court of chancery should be invoked to compel him, if he otherwise refuses, to give legal effect to his agreement by executing a sufficient conveyance of the title. An enlightened and proper sense of justice teaches us, without the aid of legal science, that the administration of justice would be defective and in some instances a mockery, if it did not embrace the power to afford adequate and specific redress in such cases. The court of chancery possesses the power to reform conveyances that are defective or imperfect, or that do not conform to the agreement of the parties ; and also to compel a party to execute a conveyance in the due performance of an executory contract in some cases. And to understand how far that power has been exercised, and to guide us in the decisions of this case, it will be necessary to advert to some of the leading cases. It will be found in all these cases that the claims have been based upon agreements, and agreements fully proved, and in reference to the specific right or interest sought therein to be enforced. And there is also another element brought in to confirm to the court

the peculiar jurisdiction claimed for it in such cases; and that is, that conscience and honesty require that the vendor should be bound to make good the bargain on his part, by executing a conveyance that shall be effectual to transfer the title or interest which he agreed to sell, and for which he has secured the payment; and which the purchaser had bought in good faith. If the vendor, under such circumstances, shall withhold the title by refusing to convey, the court considers it against conscience, if not fraudulent.

The cases cited in the opinion of the assistant vice chancellor, and relied upon by the respondents, are naturally divided into three classes. 1. Those in which agreements for the sale of an inheritance have been brought before the court, and have been enforced. These cases are certainly of questionable authority, and have been disregarded by very able and eminent judges, both in this country and in England. But in my view it is unnecessary to examine and decide on which side the balance of authority is to be found; for I think that this class has no necessary bearing on the question to be determined in this case. 2. Those in which the grantor supposed that the estate or interest concerning which the contract was made and the conveyance executed, was in him at the time; but in which fact he was mistaken. He afterwards, however, becomes vested with the same interest or title which he bargained to sell, and for which he was paid; and a court of equity compelled him to convey to the bargainee. 3. Where there is a contract to convey an estate which the vendor does not own at the time. If he afterwards becomes the owner, the court will compel a specific performance.

The second is the only class that it is important to consider; for if this case does not fall within that class, it cannot, I think, be sustained. There is one feature running through all these cases which it is important should be kept in mind; and that is, that the precise right, title or interest which the vendor agreed to sell, and intended to convey, and supposed he had conveyed, and the one which the purchaser thought he had secured, is the one which the complainants in equity require

should be conveyed to them. The very subject of their bargain—what the purchaser honestly bought and paid for, and the seller intended to convey—courts of equity have said, in some cases, he shall convey, if he acquires the title afterwards, or if his conveyance was ineffectual.

I will examine some of the leading cases on this subject, that are supposed to sustain the decree made in this case. The oldest one is *Theobalds* v. *Duffoy*, (9 *Mod.* 101.) In this there was an estate for life granted on a term for 500 years, and the residue was limited to B. He sold the remainder of the term for a valuable consideration. Afterwards the tenant for life died. When B. sold the remainder of the term, he supposed it had vested in him; but owing to a technical rule of law, it did not vest until the death of the tenant for life; and consequently his conveyance carried no title to the purchaser. B. sold the term again to another. The second purchaser was perpetually enjoined from asserting any title under the sale to him, and the term was adjudged to belong to the first purchaser. He thus received the precise interest which he bargained and paid for. *Wright* v. *Wright*, (1 *Ves. sen.* 408,) is another leading case. In this a father, supposing he owned a vested remainder in fee, granted the same to a younger son for a good consideration; while he possessed only a future, contingent interest—a mere possibility. There was in the grant a covenant for further assurance. The father died, and the contingency upon which the estate which was to vest him and his heirs having happened, the heir at law claimed the estate. The court dismissed the bill. The ancestor had conveyed upon a good consideration, the very estate which afterwards vested in the heir, *as heir*. The court said to him, this estate which you now claim through your ancestor, has been sold and conveyed by that ancestor; and it is against conscience that you, coming in the place and right of that ancestor, should repudiate his bargain.

*Clayton* v. *The Duke of Newcastle*, (2 *Ch. Cas.* 112,) is another of the same class. The owner of the estate went to the wars, beyond sea. In his absence, and when it was supposed he would not return. his heir apparent, and that heir's eldest

son united in a sale and conveyance of the estate. Afterwards the owner returned and took possession of his estate, and died. The grandson succeeded to the estate. Those claiming under the sale by son and grandson filed their bill for relief. It was decided that the grandson should convey the title. The first conveyance was made to carry into effect the bargain made on the sale of the estate, and the title which the grantors intended to convey, coming to one of the grantors, the court held that he should convey that title, which he before professed to convey.

Conceding for the sake of the argument, that the principle upon which these cases proceeded is sound, and should be upheld by this court in all analogous cases; the next step is to inquire into the nature of the case before us; and ascertain whether in all its essential features, it so resembles those above cited, as to require the application of the same rule.

In the opinion of the assistant vice chancellor, he frequently dwells upon the idea that the Bridgewater mortgage, is for some purposes, an existing incumbrance; and says in one place, that " his conclusion is, that the mortgage was the basis of the appellant's title, and that all title passed with it into the court of chancery. In all this, I think he erred. This court has decided in *Jackson* v. *Waldron*, that the mortgage was not a valid lien, but was merged and extinguished in the fee, which had matured before the assignment, by reason of lapse of time and claim of title in the mortgagee. In submission to that decision, I must assume that at the time of the assignment, the whole fee was in the Edens, for the purposes of this argument. I of course leave out of view in this respect, the transfer to the assignee in bankruptcy. In 1798, Joseph and Medcef Eden were left, by the death of their father, heirs and devisees of a large fortune, and in three years they had so managed as to squander, or be cheated out of the whole of it; for we find that in 1801, they were discharged from their debts under the bankrupt act. In September, 1804, the Edens, being executors of their father's will, find among his old papers, the Bridgewater mortgage, which had been assigned to him twenty-one years before that time; and which was upon land which their father had held

in possession as owner, from the time of the assignment to him until his death; and which he had devised in fee to Joseph upon certain conditions. These spendthrift heirs, three years after they had wasted the whole estate, undertake by their own act, as far as was in their power, to give vitality to this defunct encumbrance, upon premises devised to Joseph in fee. Joseph Winter, at that time a lawyer in New-York, was a party to this transaction, and we are well authorized in assuming with a full knowledge of all the facts. He saw upon the face of the mortgage that it had run thirty-six years, and that it furnished no evidence that it was a subsisting security. He must be considered as knowing the fact that the mortgaged premises had been devised to Joseph. And yet the young Edens as executors, with their mother as executrix, must be induced to assign it, and Winter to accept of the assignment for some purpose. Can human ingenuity devise any honest purpose? The conjecture has been indulged, and perhaps it is the only conjecture which the facts will warrant, that the design of the parties to the assignment was, by perfecting a title under the mortgage, to prevent its passing to the assignee in bankruptcy. But whatever the motive was, I feel safe in saying that it was a suspicious transaction. Winter had not bought these premises, and did not seek to possess himself of this mortgage, as a muniment of his title. But these remarks are only made to show the situation of these parties, when they came together to make this bargain, which resulted in the assignment; that we may be the better able to answer the question, what did Winter purchase? The first and most obvious observation is, that he bought, or intended to buy, the mortgage as a subsisting security for the payment of money. The assignment was made in the name of the executrix and executors, who held the title if it was still a mortgage; and Winter immediately foreclosed it as a mortgage, and claimed title through it. No stronger evidence could be furnished to prove the character of the instrument he intended to buy, or that in taking the assignment he sought to gain a title to the premises through the mortgage as an existing incumbrance. As the

Edwards *v.* Varick.

assignment contains a recital of a devise by Medcef Eden, senior, to Joseph, of the premises in question, it is reasonable to presume that Winter intended, by the clause of release, to secure to himself any title or right that Joseph might ever after set up as devisee.   But do the facts of the case warrant us in believing that Winter purchased, or had a thought of purchasing any future contingent interest that Medcef might have therein ; or that Medcef sold any such interest?   Let it be recollected that the only ground upon which equity claims jurisdiction, and the right to afford relief, in the cases cited, or in any other bearing upon this question, is that the *conscience* of the seller or his ancestor, is bound to make good a title which he has sold, and for which he has received payment; and then consider that there is an entire absence of any proof that either of the parties had in view a purchase or conveyance of Medcef's contingent interest ; and the positive proof that the principal object was a very different one ; and I ask with confidence, what conscientious obligation did Medcef contract, to convey the title when the contingency happened that vested it in him ? Again, the assignment itself is proof that no such bargain was ever made.   If Winter had purchased the future contingent interest of Medcef, he would never have taken a conveyance of that interest in the form of this release.   He would have framed a deed better calculated to express the meaning of the parties, and more appropriate for transferring that title, than this clause of release in the assignment of a mortgage.   There is no recital, as in the case of Joseph's interest ; nor any collateral evidence, showing that Medcef's future interest was the subject of contract.

Although the words are general, " release and convey all our right, title and interest," yet there is a well settled principle of law recognized in all courts, that general words in a release will be restrained to the purposes of the bargain.   In *Cole* v. *Gibson*, (1 *Ves. sen.* 507,) Lord Hardwick said, it is common in equity to restrain a general release to what was under consideration at the time of giving it.   And in *Ramsden* v. *Hylton*, (2 *id.* 310,) he says again and more fully, " It is certain that

if a release is given on a particular consideration recited, notwithstanding the release concludes with general words, yet the law, in order to prevent surprise, will construe it to relate to the particular matter recited, which was in the contemplation of the parties and intended to be released." And Chancellor Kent, in *Kirby* v. *Taylor*, (6 *John. Ch.* 251,) says, that equity will not give a release an operation beyond the intention of the parties and the justice of the case ; and he refers to the remarks of Lord Hardwicke in the above cases cited from Vesey, as containing the true rule.   The case of *Pope* v. *Whitcomb*, (3 *Russ.* 124,) is very like the present one in this respect.   Sarah Groombridge made an assignment for the benefit of her creditors, and after specifying many kinds of personal property, concluded in these words, " and all other the estate and effects of or to which she was then possessed or entitled." At that time she was entitled to a possibility in an estate under a devise, depending on survivorship.   Afterwards the contingency happened that gave her an interest in the property, and it was contended that every interest belonging to her passed, whether contingent or vested. But Lord Eldon ruled otherwise ; and that this possibility was not embraced in the general terms of the assignment, the object of which was only to convey the property she then possessed. Mr. Justice Story, in 1 *Eq. Juris.* § 145, in reference to this subject says, " When an instrument is so general in its terms, as to release the rights of the party to property, to which he was wholly ignorant that he had any title, and which was not within the contemplation of the bargain, at the time when it was made ; the court restrains the instrument to the purposes of the bargain, and confines the release to the right intended to be released or extinguished."

Nothing could be more applicable to this case than the rule of law recognized by the cases and authorities cited ; for it appears to me, that to infer from the face of this assignment, and from the circumstances under which it was executed, that the parties contemplated the sale or purchase of the future contingent interest of Medcef in these premises, is an assumption too extravagant to find any advocates.   If, therefore, we assume,

what I do not concede to be sound law, that the general terms of this clause in the assignment are broad enough to embrace Medcef's future interest, it would then be the duty of the court, in my judgment, to restrain the operation of the instrument to the purposes of the bargain.

Suppose that Winter, in 1814, after the estate had vested in Medcef by the death of Joseph, had filed his bill against Medcef to enforce the equitable claim which is made the foundation of this suit; he would have been obliged, upon the principle of the cases cited, to allege, that at the time of the assignment of the mortgage, he bargained for and purchased from Medcef this future contingent interest, and that he paid an adequate consideration therefor. And he would have been held to proof of the same, so clear and full, that no reasonable doubt could have remained with the court. Any thing short of this, would not make out a case of conscientious obligation. The instrument itself, and standing alone, could not have furnished sufficient evidence of these facts. Its general character and purpose are so foreign from such an object, and its form is so unlike any mode of conveyance usually framed with such views, as not to admit of an inference that the parties had any such bargain in contemplation.

The bill of the respondents will be found, on examination, to fall far short of making out such a case by its averments, as the authorities would seem to require. Upon this point the charges are these only: that Winter contracted with Joseph and Medcef Eden, to sell and convey to him in fee all their right, title and interest in the lot, which they agreed to do; and that Winter, under that agreement, purchased of them all their right, title and interest respectively, in said premises, of whatever kind or description the same might be. This averment is as broad as the language of the release would admit; and yet it only charges that Medcef sold and conveyed his then present right and title. It is not said that any other right or title coming through Medcef, than that which he then possessed, was the subject of any bargain, or even mentioned at the time

of the alleged bargain. There is in fact no foundation laid by any averment of a contract, for this appeal to the conscience of Medcef, to convey this future interest when it became vested in him. Then, after the insertion of the assignment in the bill of complaint, follows this averment: that thereby the said Joseph and Medcef "*intended* to convey, and *in equity* and *good conscience* ought to convey and transfer all their respective rights and interests, and *possibility of right and interest*, whether absolute or *contingent*, in the premises." If it is intended to affirm by this averment, that because the Edens "agreed to, and did sell and convey, all their right, title and interest in the lot;" therefore they "*intended* to convey and transfer all their respective rights and interest, and *possibility of right and interest*, whether absolute or *contingent*," as would appear from the frame of the bill; then in my judgment it is a *non sequitur*. It is saying, that they conveyed all their present interest, and therefore they intended to convey a possibility, a contingent interest. To bring this case within the principle of those cited, the respondents' bill should show affirmatively, and not leave it to inference, and that of the slightest kind, how the conscience of Medcef Eden became bound to convey his future contingent interest. In this respect the bill is defective; and as to proof, there is none whatever, except that which is furnished by the assignment; upon which I have already remarked.

Again; I have assumed that the form of the release conveyed only the present right, title and interest which Medcef then had, and not any future contingent estate which he might have. About this there can, I think, be no dispute. In effect this release was a mere quit-claim of all the present interest of the releasors. In *Jackson* v. *Wright*, (14 *John.* 193,) the court say, " if the grantor had no title to convey, no title, not then *in esse*, would pass, unless there was a warranty in the deed." To the same effect are 1 *Cowen,* 616 ; 9 *id.* 18 ; 4 *Wend.* 622. The rule is laid down in *Littleton,* § 446, in these words: " No right passeth by a release, but the right which the releasor hath

Edwards *v.* Varvick.

at the time of the release made ;" and the same rule has pre-
vailed, it is believed, from Littleton's time to this day; and is
not now disputed. Now then, when Medcef Eden came to
execute this assignment of the mortgage, and saw that its gen-
eral object was to transfer to Winter the rights of the mortgagor;
that among the recitals there was one that stated the devise of
the premises to Joseph ; that by the language of the release it
purported to convey only his present right in the premises ; that
there was no recital referring to his future possible interest ;
and that there was no mention made of it in any way ; what
ground had he to suppose that any future interest that he
might have could be affected by that release ? There was no-
thing to draw his attention to the subject ; but every circum-
stance tended to show him that his future interest could not be
injured by it. He had a right to rely on the language of the
release, and the principles of law that limited its operation to his
present interest. And I do not perceive how it can be imagined
that his conscience could be bound to perfect this title in the
releasee, when the title came to vest in him.

I have thus come to the conclusion that the principle of
equity law, declared in the cases cited, and which gives juris-
diction to that court in cases, where title to real estate is with-
held, when in conscience and equity it should be conveyed, is
not applicable to this case, and should not be allowed to control
it. There were several other propositions discussed on the ar-
gument, the consideration of which might go to strengthen the
conclusion to which I have arrived. But I forbear to enlarge
upon them, being fully satisfied without their aid.

I shall vote to *reverse* the decree of the court below.

GARDNER, President, and LOTT, JOHNSON, BARLOW and
HAND, Senators, delivered written opinions in the main con-
curring in the views contained in the opinion of Senator
PORTER.

Edwards *v.* Varick.

Upon the question being put, " *Shall the decree of the Chancellor be reversed ?*" the members of the court voted as follows:

*For affirmance :* Justice BEARDSLEY.

*For reversal :* The PRESIDENT and Senators BARLOW, BEEKMAN, DENNISTON, DEYO, HAND, JOHNSON, LOTT, POR-TER, SANFORD, J. B. SMITH, S. SMITH, WHEELER, WIL-LIAMS and WRIGHT—15.

Judgment reversed.